984 F.2d 823
 61 USLW 2459, 15 O.S.H. Cas. (BNA) 2097,
1993 O.S.H.D. (CCH) P 29,933
 AMERICAN DENTAL ASSOCIATION and Home Health Services and
Staffing Association, Incorporated, Petitioners,
v.
Lynn MARTIN, Secretary of Labor, and Occupational Safety and
Health Administration, United States Department of
Labor, Respondents,
and
American Federation of State, County and Municipal
Employees, AFL-CIO, and Service Employees
International Union, AFL-CIO,
Intervening-Respondents.
 Nos. 91-3865, 92-1482.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 10, 1992.
Decided Jan. 28, 1993.
 
 James C. Pyles, argued, Carmen L. Neuberger, Powers, Pyles & Sutter, Washington, DC, for Home Health Services and Staffing Ass'n, Inc. in No. 92-1482.
 Eileen M. McCarthy, Bruce Justh, argued, Dept. of Labor, Appellate Litigation, Donald S. Shire, Sol. Gen., Ann Rosenthal, Dept. of Labor, Office of the Solicitor, Washington, DC, John H. Secaras, Sol. Gen., Dept. of Labor, Chicago, IL, for Lynn Martin in No. 92-1482.
 Bruce Justh, Cynthia L. Atwood, Ann Rosenthal, Dept. of Labor, Office of the Solicitor, Ray Darling, Jr., OSHA, Executive Secretary, Washington, DC, for OSHA in No. 92-1482.
 W. Scott Railton, argued, Reed, Smith, Shaw & McClay, Donald B. Verrilli, Jr., Bruce J. Ennis, Jr., Jefferson C. Glassie, Jenner & Block, Washington, DC, for American Dental Ass'n in No. 91-3865.
 Eileen M. McCarthy, Bruce Justh, argued, Dept. of Labor, Appellate Litigation, Ann Rosenthal, Dept. of Labor, Office of the Solicitor, Washington, DC, John H. Secaras, Sol. Gen., Dept. of Labor, Chicago, IL, for Lynn Martin in No. 91-3865.
 Bruce Justh, Ann Rosenthal, Ray Darling, Jr., OSHA, Executive Secretary, Washington, DC, for OSHA in No. 91-3865.
 Laurence Gold, Washington, DC, Orrin Baird, Carol Golubock, Washington, DC, Marsha S. Berzon, argued, Altshuler, Berzon, Nussbaum, Berzon & Rubin, San Francisco, CA, for Service Employees Intern. Union, AFL-CIO, CLC in No. 91-3865.
 Laurence Gold, Mary J. Carlson, Washington, DC, Marsha S. Berzon, Altshuler, Berzon, Nussbaum, Berzon & Rubin, San Francisco, CA, for American Federation of State, County and Municipal Employees, AFL-CIO in No. 91-3865.
 Before POSNER, COFFEY, and EASTERBROOK, Circuit Judges.
 POSNER, Circuit Judge.
 
 
 1
 In 1991 the Occupational Safety and Health Administration promulgated a rule on occupational exposure to bloodborne pathogens. 56 Fed.Reg. 64004, 57 Fed.Reg. 29206, 29 C.F.R. § 1910.1030. The rule is designed to protect health care workers from viruses, particularly those causing Hepatitis B and AIDS, that can be transmitted in the blood of patients. Promulgated after a protracted notice-and-comment rulemaking proceeding, the rule and its supporting reasons occupy 178 densely packed pages in the Federal Register. Most employers in the health care industry have accepted the rule, which in essence requires compliance with procedures for health care workers recommended by the Centers for Disease Control (since renamed the Centers for Disease Control and Prevention), the federal agency responsible for the control of contagious diseases. Many of these employers, indeed, had adopted the procedures as soon as the CDC recommended them. Three employer groups, however, challenge the rule--dentists, represented by the American Dental Association, and medical-personnel and home-health employers, both represented by the Home Health Services and Staffing Association. Medical-personnel firms supply health care workers on a temporary basis to hospitals and nursing homes, while home-health firms supply such workers to patients at home.
 
 
 2
 AIDS is caused by a virus (HIV) that can be transmitted, among other means, by introducing the blood of an infected person into the bloodstream of an uninfected one. If blood of a dental or medical patient who is HIV positive spatters on a health care worker's skin where the skin is cut or abraded, or the worker accidentally sticks himself with a scalpel or hypodermic needle or other medical instrument on which there is fresh blood of an HIV carrier, the worker may become infected--with, so far as anyone knows, invariably fatal results. The AIDS virus is not, however, robust, and is not easily transmitted by the sorts of contact that patients usually have with health care workers. As of 1991, there had been only 24 confirmed cases of U.S. health care workers infected with the AIDS virus by patients since AIDS was first diagnosed in 1981.
 
 
 3
 Hepatitis B is a far more common disease than AIDS, though less scary, publicized, or stigmatized. The Hepatitis B virus (HBV) produces antibodies that fight the virus but at the same time destroy liver cells in which the virus has lodged. Although most infected persons recover uneventfully, about 1 percent die and about 6 to 10 percent of adult (and a much higher percentage of child) victims of Hepatitis B become carriers. The virus is much more virulent than the AIDS virus, and the introduction of a carrier's blood into another person's bloodstream is a particularly efficient means of transmission. Unlike the AIDS virus, which cannot survive exposure to air, HBV can survive on the surface of a piece of clothing or other material at room temperature for a week and can thus be spread by dirty laundry. Also unlike the AIDS virus, there is a vaccine against HBV, effective in 85 to 97 percent of healthy adults who receive it. Nonetheless, because of the greater virulence of HBV and the fact that many health care workers are not vaccinated, patient-communicated Hepatitis B kills about 200 health workers in the U.S. per year--roughly 100 times the number of such workers infected by patient-communicated HIV.
 
 
 4
 The precautions against infection of health care workers by the two viruses is similar, except that the vaccine against HBV offers a protection that has no counterpart with regard to HIV, and contaminated laundry poses a danger of spreading HBV that also has no counterpart with regard to HIV. OSHA's rule reflects the public-health philosophy of "universal precautions," which means precautions against the blood of every patient, not just the blood of patients known or believed likely to be carriers of HBV or HIV. The precautions are various. They include engineering controls (such as requirements for the location of sinks), work practice controls (such as standards of care in handling contaminated sharp instruments, such as needles), requirements for personal protective equipment such as gloves, masks, goggles, and gowns, requirements for housekeeping (covering such things as the cleaning of contaminated surfaces and laundry and the disposal of contaminated waste), reporting requirements, and provisions for medical care. The rule requires the employer to offer employees who are at risk of exposure to the blood of patients the Hepatitis B vaccine at the employer's own expense, though it allows the employees to decline to be vaccinated. An employee who is involved in an "exposure incident," such as being stuck with a contaminated needle, must be offered at the employer's expense a confidential blood test for HBV and HIV; that is, only the employee is entitled to the result of the test.
 
 
 5
 In deciding to impose this extensive array of restrictions on the practice of medicine, nursing, and dentistry, OSHA did not (indeed is not authorized to) compare the benefits with the costs and impose the restrictions on finding that the former exceeded the latter. Instead it asked whether the restrictions would materially reduce a significant workplace risk to human health without imperiling the existence of, or threatening massive dislocation to, the health care industry. For this is the applicable legal standard. Occupational Safety & Health Act, § 6(b)(5), 29 U.S.C. § 655(b)(5); Industrial Union Dept., AFL-CIO v. American Petroleum Institute, 448 U.S. 607, 642-45, 655-56, 100 S.Ct. 2844, 2864-65, 2870-71, 65 L.Ed.2d 1010 (1980) (the "benzene" case) (plurality opinion); American Textile Mfrs. Institute, Inc. v. Donovan, 452 U.S. 490, 509-12, 530-36, 101 S.Ct. 2478, 2490-92, 2500-04, 69 L.Ed.2d 185 (1981) (the "cotton dust" case). The agency focused on HBV rather than on HIV because of the minute number of health care workers who have been infected by the latter virus. It estimated that the rule would eliminate between 113 and 129 annual deaths of health care workers from Hepatitis B, and a somewhat higher figure (187 to 197) if deaths of nonworkers infected by health-care workers who (but for the rule) would be carriers are factored in as well. (In making this additional calculation, OSHA expressed an uncharacteristic, but as it seems to us commendable, concern with the indirect effects of its rule. On the other hand it did not consider the reduction in medical care that might result from the rule's effect in making the practice of medicine more costly--more on this shortly.) Most of these deaths would be avoided by the vaccine, but by no means all, because the vaccine is not a hundred percent effective and, more important, because many health care workers refuse to be vaccinated. Hence the other parts of the rule would have a positive effect even on Hepatitis B; and there is no vaccine (or cure) for AIDS.
 
 
 6
 OSHA's evaluation of the effects of the rule, relying as it does on the undoubted expertise of the Centers for Disease Control, cannot seriously be faulted, at least by judges. Hence we cannot say that the rule, viewed as a whole, flunks the test of material reduction of a significant risk to workplace health. As for the impact on the health care industry, OSHA estimated the total cost of compliance with the rule at $813 million a year, clearly not enough to break the multi-hundred-billion-dollar healthcare industry. The rule's implicit valuation of a life is high--about $4 million--but not so astronomical, certainly by regulatory standards, Cass R. Sunstein, After the Rights Revolution: Reconceiving the Regulatory State 239 (1990) (App. B), as to call the rationality of the rule seriously into question, especially when we consider that neither Hepatitis B nor AIDS is a disease of old people. These diseases are no respecters of youth; they cut off people in their working years, and thus in their prime, and it is natural to set a high value on the lost years. Nor is death the only consequence of these diseases. AIDS causes protracted pain and disability before death, and Hepatitis B causes pain and disability and often permanent liver damage, even when the patient "recovers."
 
 
 7
 No doubt the agency's $813 million estimate is an underestimate. It ignores time costs--more precisely, many or most time costs, for the statement accompanying the rule does contain a cost estimate for "work practices." But apparently it is limited to "handwashing/glove change" and to the added time for using "safety syringes." Those are not the only time costs, and the rest seem to have been left out. Individually slight, the time costs of suiting up with protective clothing, and of other preparatory activities required by the rule, could be cumulatively significant. Certain efficiency losses were also excluded, of which we give an example later. But the petitioners made no effort in the rulemaking proceeding to quantify these costs or to provide any basis for supposing them to be huge.
 
 
 8
 OSHA also exaggerated the number of lives likely to be saved by the rule by ignoring lives likely to be sacrificed by it, since the increased cost of medical care, to the extent passed on to consumers, will reduce the demand for medical care, and some people may lose their lives as a result. The agency's consideration of the indirect costs of the rule is thus incomplete. Cf. Competitive Enterprise Institute v. NHTSA, 956 F.2d 321 (D.C.Cir.1992); International Union, UAW v. OSHA, 938 F.2d 1310, 1320 (D.C.Cir.1991). How many lives the rule is likely to sacrifice, however, we do not know; and again the petitioners make no effort to come up with a number. So while $4 million doubtless underestimates the agency's implicit valuation of each life actually likely to be saved by the rule, we do not know how great the underestimate is and we cannot resolve our doubts against the agency. We add that the $4 million ignores the benefits to workers who will be spared illness--for remember that 99 times as many people get Hepatitis B as die from it.
 
 
 9
 As an original matter we might have been inclined to think that the regulation of the safety of the medical and dental workplace could be left largely to the market, that doctors, dentists, and other health care workers have a stronger incentive than the government to protect themselves from health hazards at reasonable cost, that their employees are compensated in their wages for what is after all a modest risk, and that health care workers who refuse to be vaccinated against Hepatitis B are knowingly assuming the risk and should be left to bear the consequences without government interference. But the occupational safety and health law is constructed on different premises that we are not free to question, and perhaps the infectious character of HIV and HBV warrants even on narrowly economic grounds more regulation than would be necessary in the case of a noncommunicable disease.
 
 
 10
 The petitioners, moreover, do not attempt to blast the entire rule out of the water. They do not argue that its net contribution to the safety of health workers is likely to be trivial, or its net costs crushing. They do not contend that there should be no regulation of bloodborne pathogens. They zero in on the particular features of the rule that pinch their clienteles and argue that the pinch is so tight that we should invalidate the rule insofar as it applies to the industries that they represent. We start with the dentists. Mainly they object that they have been lumped in with medical personnel, such as surgeons, who are far more exposed to patients' blood than dental workers are and, in other respects as well, work under relevantly different conditions. For example, although the rule is entitled a rule about blood borne pathogens, it requires universal precautions in any dental procedure in which the patient's saliva may drip or spray or splatter on the dental worker. But it is not quite true that OSHA treated all branches of the health care industry in a lump. It gave separate consideration to every point raised before it by the dental association. It pointed out that the saliva of dental patients frequently contains blood--even in such routine procedures as having one's teeth cleaned by a dental hygienist--and that it is possible, though far from certain, that even a small quantity of blood, diluted by saliva or some other fluid, can sometimes be infective. This was not some fantasy of OSHA. The Centers for Disease Control, while generally exempting saliva from the list of body fluids to which universal precautions should apply, recommended "special precautions" for dental workers exposed to saliva from patients. Did the CDC mean universal precautions? Its language is unclear, requiring interpretation. OSHA was entitled to adopt an interpretation that leaned "on the side of overprotection rather than underprotection." Industrial Union Dept., AFL-CIO v. American Petroleum Institute, supra, 448 U.S. at 656, 100 S.Ct. at 2871.
 
 
 11
 What OSHA did not do was attempt to disaggregate the risk industry by industry. While it carefully disaggregated the costs of compliance, to see whether any industry within the health care sector would be imperiled by the rule, it did not attempt to determine separately the risk of HIV or HBV infection in dentistry, in home-health services, in thoracic surgery, in ophthalmology, and so forth. It did not attempt to determine the number of dental employees, say, who have contracted Hepatitis B from their patients; and it inflated the fact that only 1 of the 24 health care workers infected by a patient with AIDS in the U.S. was a dental employee by calling it a "significant percentage" of all occupational HIV infections. Well, 4.16 percent is a significant percentage, but not a meaningful one in this case, given the smallness of the sample. Citing cases like International Union, UAW v. OSHA, 938 F.2d at 1322, the dental association argues that the finding that the benzene opinion requires OSHA to make--"that the workplaces in question are not safe," 448 U.S. at 642, 100 S.Ct. at 2864--entails a determination of the safety (or riskiness) of, at the least, each type of workplace.
 
 
 12
 OSHA cannot impose onerous requirements on an industry that does not pose substantial hazards to the safety or health of its workers merely because the industry is a part of some larger sector or grouping and the agency has decided to regulate at wholesale. That would be an irrational way to proceed. But neither is the agency required to proceed workplace by workplace, which in the case of bloodborne pathogens would require it to promulgate hundreds of thousands of separate rules. It is not our business to pick the happy medium between these extremes. It is OSHA's business. If it provides a rational explanation for its choice, we are bound. Associated Builders & Contractors, Inc. v. Brock, 862 F.2d 63, 68 (3d Cir.1988). It explained that while the cost of compliance with the precautions that the CDC has recommended (and OSHA has required) against bloodborne pathogens varies in a readily determinable fashion from industry to industry, the risk of infection does not. The risk goes with practices (so protective clothing is required only where being splashed with blood or other infective liquid can reasonably be anticipated, whether it is a dentist's office or a hospital operating room) rather than with industries, and the rule is therefore based on practices rather than on industries. The HIV or HBV carrier bears menace with him as he makes the rounds from health care provider to health care provider. The risk of blood splatters and needlesticks is greater in some medical procedures than in others, but a dental hygienist is as likely to be splattered by blood contained in saliva as is many a worker in a hospital or a doctor's office. The idea behind requiring universal precautions for health care workers is to protect those workers in any situation in which there is a nontrivial risk of physical contact with a patient's blood, and these situations arise in dentists' offices as well as in doctors' offices and hospitals. OSHA was required neither to quantify the risk to workers' health nor to establish the existence of significant risk to a scientific certainty. Industrial Union Dept., AFL-CIO v. American Petroleum Institute, supra, 448 U.S. at 655-56, 100 S.Ct. at 2870-71. It is true that because fewer people have dental than medical insurance, and therefore more people pay for dental care out of their own pockets, the higher price of dentistry that is a likely consequence of the rule will have a greater impact on demand; and inadequate dental care is a source of pain and suffering. But again the dental association made no effort to quantify this impact, though techniques for doing so exist in economics.
 
 
 13
 As to the specific precautions required by the rule, the association makes a number of arguments, of which a representative example is that children may be traumatized by the sight of a dentist wearing goggles. "Traumatized" is putting it too strongly, and the rule does not require goggles--at least for most dental procedures, ordinary glasses with side shields are all that is required. Nonetheless the problem of calming children in the dentist's chair, without resort to nitrous oxide, is a serious one that the rule may aggravate, but again the dental association makes no effort to estimate the gravity of the harm. And while as we have suggested there is a time cost to decking oneself out in protective clothing which OSHA ignored, so does the dental association. In this example, and others unnecessary to discuss, the association is contesting requirements that, whether wise or not, are within the broad bounds of the reasonable, involving as they do technical issues on which the judgments of the CDC and OSHA are entitled to respect by the nonspecialist, biomedically unsophisticated Article III judiciary, at least in the absence of a more systematic showing of harms than attempted by the dental association.
 
 
 14
 This is true even with regard to the question whether a health worker should be permitted to conceal his awareness of being infected from his employer and the employer's patients. The problem with nonconfidential medical tests is that the cost of flunking is high--loss of a job, for example--and this deters people from taking the test. A dental worker who knew that if he were infected he would lose his job might simply not report an exposure incident. The dental association does not argue that testing should not be encouraged, or alternatively that all dental workers should be tested regularly without regard to any exposure incidents. It asks us to balance the pros and cons of the confidentiality provision. That is not our job. We add that nothing in the rule forbids a dentist to require his employees to have a periodic HIV or HBV test, with disclosure of the results to him. The rule's provision on confidentiality is limited to the test that an employer is required to offer a worker after an exposure incident.
 
 
 15
 The dental association complains that the rule goes too far in requiring dentists to "ensure" that their employees comply with the requirements of the rule. They say this imposes strict liability, which OSHA acknowledges it cannot do. Brennan v. OSHRC, 502 F.2d 946, 951 (3d Cir.1974); Brennan v. Butler Lime & Cement Co., 520 F.2d 1011, 1017 (7th Cir.1975); Pennsylvania Power & Light Co. v. OSHRC, 737 F.2d 350, 354 (3d Cir.1984). In so saying they may seem not really to be challenging the rule but rather to be raising an interpretive question--how strictly will OSHA interpret "ensure"? Interpretive questions that cannot be answered until a rule is applied are premature when raised in a challenge to the rule on its face, mounted at the time the rule is promulgated. But here the question is neither unanswerable, nor severable from questions that clearly are ripe, such as whether the costs of compliance with the rule will be so staggering as to imperil the dental industry (in which event the rule would be invalid). The stricter the liability, the more costly the rule. It is reasonably plain, however, that OSHA did not by using the word "ensure" seek to impose strict liability. It explained that the employer's responsibility doesn't end with furnishing his employees with protective gear, for example; he must do everything he can reasonably be expected to do to see that they use it. Like an employer made liable for his employees' conduct not by the principle of respondeat superior (a form of strict liability) but by the negligence principle, Lancaster v. Norfolk & Western Ry., 773 F.2d 807, 818-19 (7th Cir.1985), which requires due care in hiring, training, supervising, monitoring, disciplining, and retaining employees--the kind of employer liability imposed in sexual harassment cases, Guess v. Bethlehem Steel Corp., 913 F.2d 463, 465 (7th Cir.1990), in other civil rights cases, Hunter v. Allis-Chalmers Corp., 797 F.2d 1417, 1421-22 (7th Cir.1986), and in cases under the common law's "fellow servant" doctrine, Pomer v. Schoolman, 875 F.2d 1262, 1266 (7th Cir.1989)--the employer subject to OSHA's rule on bloodborne pathogens must take all reasonable measures to prevent his employees from violating the rule, but if despite these measures the employee violates the rule, the employer is off the hook. Pennsylvania Power & Light Co. v. OSHRC, supra; Capital Electric Line Builders of Kansas, Inc. v. Marshall, 678 F.2d 128 (10th Cir.1982); Brock v. L.E. Myers Co., 818 F.2d 1270, 1277 (6th Cir.1987).
 
 
 16
 The costs of compliance with OSHA's rule, once the issue of strict liability for unforeseeable misconduct by employees is laid to one side, can hardly be thought so great as to imperil dentistry. Annualized, these costs are estimated to be equal to less than one-third of one percent of the industry's annual revenues. This may overstate the actual cost, not to society as a whole (International Union, UAW v. OSHA, supra, 938 F.2d at 1320) but to the industry. When an industry is subjected to a higher cost, it does not simply swallow it; it raises its price and reduces its output, and in this way shifts a part of the cost to its consumers and a part to its suppliers (granted, those suppliers may include the firms constituting the industry). This very point is the basis of the dental association's argument that OSHA's rule is likely to cause a deterioration in dental care as dental patients flee the higher prices resulting from the industry's efforts to shift some of the costs of compliance with the rule to its customers. There are some omitted costs, as we have noted, but not enough to make a decisive difference; nor does the association emphasize them.
 
 
 17
 The dental association makes some other jabs at the rule, but they have less merit than those we have discussed so we move on to the objections of the home health and medical personnel industries. These objections have greater force because they are based primarily on the fact, which has no counterpart in dentistry or for that matter in most other branches of the health industry, that the home health and medical personnel industries--we'll call them the health personnel industry for short--do not control the sites at which their employees work. This does not affect compliance with the parts of the rule relating to HBV vaccination, post-exposure testing and treatment, and recordkeeping, but it does affect the ability of the employer to comply with the requirements for protective clothing and equipment, because his employees do not work in his presence. It especially affects the employer's ability to comply with site-specific precautions required by the rule, such as ensuring that the work site is maintained in a clean and sanitary condition and that the worker has convenient access to running water in the event of exposure to blood or other potentially infective materials. These problems do not seem serious with regard to the branch of the industry that supplies medical personnel to hospitals, nursing homes, and other facilities that are themselves required to comply with the rule, but they could be serious with regard to the branch of the industry that supplies personnel to homes. Save for allowing the employer to substitute handwashing chemicals for a ready source of running water, the rule gives no recognition to the special problems of the industry although they were brought to OSHA's attention during the rulemaking proceeding. OSHA's brief relies on what it calls the "multi-employer worksite defense," whereby an employer that cannot control a hazard is not liable for the exposure of its employees to the hazard if it took whatever precautionary steps were reasonable in the circumstances (or reasonably lacked the knowledge to recognize a condition as hazardous, but that is not a factor here). In effect OSHA asks us to read the defense into the rule.
 
 
 18
 Is the absence from the rule of any explicit recognition of the acute compliance problem apparently faced by the health personnel industry, and in particular the branch that supplies medical workers to patients' homes, a fatal omission? Administrative rules and decisions, like statutes, are enacted against a background of existing laws and understandings that do not have to be repeated in every new rule in order to have force. Perhaps the multi-employer worksite defense is so well established in the law of occupational safety and health that it formed part of the implicit background of the bloodborne-pathogens rule, which would explain OSHA's seeming insouciance in assimilating the home personnel industry to health care industries that control the sites at which the care is provided. Apart from its having been clearly stated by the Occupational Safety and Health Review Commission, which reviews orders of OSHA citing employers for violations of the Occupational Safety and Health Act, and endorsed by every court to consider it, see, e.g., Anning-Johnson Co., 4 O.S.H.C. 1193, 1198-99 (1976); Harvey Workover, Inc., 7 O.S.H.C. 1687, 1689 (1976); D. Harris Masonry Contracting, Inc. v. Dole, 876 F.2d 343 (3d Cir.1989); see also Anning-Johnson Co. v. OSHRC, 516 F.2d 1081, 1089 (7th Cir.1975), the rule or some variant of it is implicit in the principle we have just examined that the Act does not impose strict liability.
 
 
 19
 One problem, however, is that the Review Commission is not OSHA. OSHA is legislator and prosecutor, OSHRC the judge. Martin v. OSHRC, --- U.S. ----, ----, 111 S.Ct. 1171, 1174, 113 L.Ed.2d 117 (1991); see also Cuyahoga Valley Ry. v. United Transportation Union, 474 U.S. 3, 7, 106 S.Ct. 286, 288, 88 L.Ed.2d 2 (1985) (per curiam). By failing to mention the multi-employer worksite defense in the blood-borne-pathogens rule, OSHA may, despite its appellate lawyers' disclaimer--which the doctrine of SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), obliges us to ignore--be signifying its disagreement that the defense is part of the law. If so, this could mean that OSHA was planning to enforce the rule as written, that is, without any such defense. If that is the proper interpretation of the rule's silence, we would have to invalidate the rule (in part), as we think the defense is part of the law. The alternative interpretation of the rule's silence is that OSHA accepts the defense as something that is to be read into all of its rules; that OSHA has bowed to the Review Commission and the courts.
 
 
 20
 We need not choose between these interpretations. Silence as acquiescence would not be an adequate response by OSHA to the circumstances of this case. The multi-employer worksite defense was developed for the construction industry and has, so far as we are able to discover, rarely been applied outside of it. What contours it should have in so unusual a worksite setting as the health personnel industry presents should not be left to appellate tribunals, whether OSHRC or this court, to decide. OSHA should set the contours in the first instance. Maybe they should be narrower in this industry than in the construction industry, maybe broader, maybe different. So important a question should be settled now, not left to enforcement proceedings. Since we know that the Occupational Safety and Health Act does not impose strict liability on employers, we know that the members of the health personnel industry need make only reasonable efforts to comply with the rule; but what this means at sites that the employers do not control eludes us. Can the employer take the position that he has no responsibility for the condition of those sites? Or must he inspect each site before he allows his employees to work there? Must he do that even if the site is a private home? Who knows? OSHA had an obligation to consider such questions and the general issue that they present before imposing a medley of restrictions that, so far as appears, the industry cannot comply with.
 
 
 21
 So the rule must be vacated insofar as it applies to sites not controlled either by the employer or by a hospital, nursing home, or other entity that is itself subject to the bloodborne-pathogens rule. The other objections lodged by the health personnel industry against the rule, however, either duplicate those of the dental association or plainly lack merit. So in the main the rule must be upheld. Which is not to say that it is a good rule. It may be unnecessary; it may go too far; its costs may exceed its benefits. Concern with the cost of health care in the United States is growing, and OSHA has received a steady drumbeat of criticisms even from supporters of public regulation of occupational health and safety. E.g., Sunstein, supra (index references to Occupational Safety and Health Act and Occupational Safety and Health Administration). But our duty as a reviewing court of generalist judges is merely to patrol the boundary of reasonableness, and, with the exception we have noted, OSHA's bloodborne-pathogens rule--accepted as it has been by most health care industries and based as it is on the recommendations of the nation's, perhaps the world's, leading repository of knowledge about the control of infectious diseases--does not cross it.
 
 
 22
 The petition to review filed by the American Dental Association is denied. The petition of the Home Health Services and Staffing Association is granted in part and denied in part, as explained above.
 
 
 23
 COFFEY, Circuit Judge, concurring in part, dissenting in part.
 
 
 24
 Section 3(8) of the Occupational Safety and Health Act defines "occupational safety and health standard" as a standard which requires the adoption of practices "reasonably necessary or appropriate to provide safe or healthful employment and places of employment." 29 U.S.C. § 652(8) (emphasis added). Section 6(b)(5) of the Occupational Safety and Health Act states:
 
 
 25
 "The Secretary, in promulgating standards dealing with toxic materials or harmful physical agents under this subsection, shall set the standard which most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure to the hazard dealt with by such standard for the period of his working life."
 
 
 26
 29 U.S.C. § 655(b)(5) (emphasis added).
 
 
 27
 The dental profession, and the employees in the home health care and temporary medical services fields, argue convincingly that it is improper for the Occupational Safety and Health Administration's final bloodborne pathogens standard to be applied uniformly to their respective fields since the levels of exposure to bloodborne pathogens are vastly different among the various disciplines. The rule adopted can best be classified as an attempt to try to kill a fly with a sledgehammer. The rule was drafted partially in response to the public hysteria surrounding AIDS created by the media's failure to balance their reporting with scientific data on transmission. The rule was not drafted in response to an established significant risk of harm to employees. The dangers of transmitting the blood-borne pathogen hepatitis B have been well-established for years yet for reasons unexplained OSHA did not concern itself with that risk in the workplace prior to November 1987. Based on the record, I am forced to assume that because of the excessive media coverage regarding the AIDS virus, fueled by one single episode involving Kimberly Bergalis in Florida contracting AIDS from her dentist,[1] OSHA decided to promulgate this over-expansive rule (combining the AIDS virus with hepatitis B) in the health care field.[2] The rule unduly burdens health care employers, including but not limited to dentists, doctors and hospitals, while offering but minimal benefit to their employees, and furthermore it is estimated that it will increase health care costs some $817 million annually. Additionally, the rule duplicates the scientifically based and well-reasoned guidelines of the Centers for Disease Control and Prevention (CDC) a governmental agency medically and scientifically qualified to determine and evaluate if there is in fact a significant risk in the health care area and, if so, propose reasonable, efficient guidelines.
 
 
 28
 The petitioners (American Dental Association and Home Health Services and Staffing Association) base their challenges on four theories: 1) OSHA failed to establish a significant risk within their individual respective disciplines, and thus, no basis exists for OSHA to regulate; 2) OSHA has failed to establish that the final rule will result in substantial benefit to health care workers, much less that the guidelines and regulations of the CDC and the respective states are inadequate; 3) the rule is aimed at protecting employees only and thus lacks concern for and fails to protect the consumer (dental patients and home health care patients) by increasing health care costs and at the same time denying the consumer access to essential information necessary to the granting of informed consent; and 4) there are flaws in the feasibility analysis. I concur with the majority holding concerning the failure of the rule to make an exception for employers who have no control over the work site (home health and temporary medical services) op. at 830-31. I suggest that the United States Congress must address the question of whether there is a need to duplicate the education, investigation and prevention efforts of the CDC and state health agencies, thus increasing health care costs, and whether OSHA is the proper agency to regulate health care given their lack of experience, knowledge and expertise in comparison to the CDC and state health agencies. In the alternative, the entire rule should be remanded to OSHA for the reasons detailed in this opinion.
 
 I. SIGNIFICANT RISK
 
 29
 In Industrial Union Dep't v. American Petroleum Inst., 448 U.S. 607, 642-44, 100 S.Ct. 2844, 2864-65, 65 L.Ed.2d 1010 (1980) (the Benzene case), the Supreme Court required that OSHA determine whether a "significant risk" exists before it can promulgate a rule. The Court's mandating this analysis demonstrated concern that an insignificant risk must not be allowed to "justify pervasive regulation limited only by the constraint of feasibility" and to restrain OSHA's "power to impose enormous costs that might produce little, if any, discernible benefit." Benzene, 448 U.S. at 645, 100 S.Ct. at 2865. For regulations under § 6(b)(5), such as the bloodborne pathogens standard, "the logic of Benzene thus calls for a fairly high standard of significance." International Union, UAW v. OSHA, 938 F.2d 1310, 1322 (D.C.Cir.1991). The Benzene case places the burden of proof on OSHA to demonstrate that a significant risk of harm to employees exists. Benzene, 448 U.S. at 653, 100 S.Ct. at 2869.
 
 
 30
 Additionally, § 6(b)(5) of the Occupational Safety and Health Act mandates that OSHA standards satisfy the "best available evidence" and feasibility requirements. 29 U.S.C. § 655(b)(5). OSHA states that in an attempt to satisfy the best available evidence requirement concerning the risk of bloodborne pathogens it conducted a number of hearings and received a myriad of comments prior to the adoption of the final rule.[3] Further, OSHA sets forth that it reviewed nationwide statistical sample surveys from health care disciplines[4] to determine the possibility of exposure to blood or other potentially infectious materials in twenty-four (24) industry sectors.[5] 56 Fed.Reg. 64041-64043.
 
 
 31
 Even though the U.S. Supreme Court held in American Textile Mfrs. Institute, Inc. v. Donovan, 452 U.S. 490, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981) (the Cotton Dust case), that OSHA is not required to conduct a cost benefit analysis when promulgating a rule under § 6(b)(5), the Supreme Court explained the propriety of OSHA adopting the most cost-effective regulation:
 
 
 32
 "In addition, if the use of one respirator would achieve the same reduction in health risk as the use of five, the use of five respirators was 'technologically and economically feasible,' and OSHA thus insisted on the use of five, then the 'reasonably necessary or appropriate' limitation might come into play as an additional restriction on OSHA to choose the one-respirator standard. In this case we need not decide all the applications that § 3(8) might have, either alone or together with § 6(b)(5)."
 
 
 33
 452 U.S. at 514 n. 32, 101 S.Ct. at 2493 n. 32. Thus it is reasonable to expect OSHA not only establish that a significant risk exists but also that the regulation adopted is the most cost-effective procedure.
 
 
 34
 While I agree with the majority that "we are not free to question" Congress' intentions in granting OSHA the power to regulate the workplace, op. at 826, I do not believe that Congress ever intended that OSHA regulate the highly technical health care field. Congress was in no position in the year 1970 to foresee the dramatic advancements in the field of medical technology, such as heart catheterization and angioplasty procedures, heart bypass surgery, organ transplants, microscopic surgery, and the developments in nuclear medicine among others. Nor do I think Congress intended for OSHA to invade the privileged relationship between medical professionals and their patients. Accordingly, Congress may wish to revisit this matter to determine whether OSHA is the most qualified agency to regulate health care as we move into the 21st century.
 
 
 35
 II. DISAGGREGATING INDUSTRIES WHEN PERFORMING SIGNIFICANT
 
 RISK ANALYSIS
 
 36
 The majority acknowledges that "OSHA cannot impose onerous requirements on an industry that does not pose substantial hazards to the safety or health of its workers merely because the industry is a part of some larger sector or grouping and the agency has decided to regulate at wholesale." Op. at 827. In order to achieve its desired result of regulation, OSHA made a hodgepodge of findings (estimating the number of health care workers infected with hepatitis B, and combining the risk of exposure to all bloodborne pathogens in the various fields of medical and dental endeavor) resulting in nothing but a generalized determination of significant risk applicable to the twenty-four industry sectors noted above. It would have been more scientifically acceptable had OSHA disaggregated the twenty-four sectors (even those with as few as 8,000 employees, see infra note 8) to determine if in fact a scientifically established risk existed in a specific field of health services as opposed to a hypothesized risk.[6] Although I realize OSHA need not "establish the existence of significant risk to a scientific certainty," op. at 827-28, OSHA must do more than rely on estimates of risk. OSHA's application of the law in that manner is directly contrary to the D.C. Circuit's recent decision in International Union, UAW v. OSHA, which states:
 
 
 37
 "OSHA nowhere explains its logic. Just because paper mill equipment (which was already subject to a lockout requirement) poses a significant hazard does not mean that sewing machines do. While we have recognized OSHA's need to avoid "minuscule industry subcategories" for administrative convenience, ... there are no obvious barriers to disaggregation here. In fact, OSHA has in past years promulgated a wide variety of industry and equipment-specific lockout standards. As we have insisted that OSHA explain its refusal to disaggregate at the behest of unions claiming that reliance on overbroad categories denied them adequate protection, ... we similarly remand for it to explain how its aggregated approach here conforms to its interpretation of the act."
 
 
 38
 938 F.2d at 1322 (emphasis added) (citations omitted).
 
 
 39
 Certainly OSHA can neither logically nor reasonably claim that the dental, home health and temporary medical personnel sectors are "minuscule industr[y] subcategories" when one considers that there are some 316,000 affected dental employees, 212,246 affected home health employees and 163,477 affected temporary medical personnel. 56 Fed.Reg. 64055. An example of OSHA's hodgepodge of findings is the method it used in determining whether a significant risk of infection exists. OSHA combined the risk of infection during surgical procedures in large metropolitan area public hospitals with the risk in a single chair dental practice and in a home health care environment (private residence care). As established in this opinion, OSHA has failed in the record to accurately or scientifically analyze the risk of exposure to bloodborne pathogens. This is most evident from OSHA's decision to combine the risks of the individual sectors in the health care area and then conclude that its self-generated, artificial risk level exists in each respective health care area. It is interesting to note that this commingling of diverse groups is contrary to OSHA's prior practice of disaggregating industries in rule making proceedings for purposes of analyzing significant risk when promulgating a rule governing exposure to toxic substances. See 29 C.F.R. at 1910.1043(a)(2) (OSHA's final Cotton Dust standard); Texas Independent Ginners Ass'n v. Marshall, 630 F.2d 398, 403 (5th Cir.1980).[7] OSHA properly excluded the cotton ginning industry from the airborne concentration of cotton dust standard because "gin employees are only exposed to cotton dust for a short season, ... the proper maximum level is not known for such seasonal exposure and ... the emission controls are infeasible...." Id. at 403.[8] The court added that imposing emission controls on the cotton ginning industry would "increase the construction cost of the average gin by sixty-five percent and would increase the farmer's costs by fifty percent." Id. Certainly, if OSHA is able to create an industry-specific feasibility analysis for the cotton ginning industry of 58,000 employees and other industries (see supra footnote 8), it can and should in fairness to the dental profession, consisting of over 316,000 employees, be required to create an individual industry specific significant risk analysis. 56 Fed.Reg. 64055.[9] Apparently OSHA realized it was unable to establish a significant risk in the appellants' respective fields and/or for the sake of convenience chose to combine the risk present in the entire health care area.
 
 
 40
 Furthermore, based on the record it is evident that OSHA failed to consider the unique, separate and distinct risks of occupational exposure to the HBV and HIV viruses when it determined that there is a "significant risk" in the health care profession. For instance, of the twenty-five cases studied of health care workers infected with HIV through occupational exposure not one home health care employee and only one dentist (of the 100,000 practicing dentists in the United States) tested positive.[10] 56 Fed.Reg. 64017-19 (listing the cases worldwide where occupational exposure to HIV infected blood was the suspected cause of a health care worker's positive HIV test). Certainly one suspected case of occupational transmission of HIV falls far short of establishing a significant risk to the dental field of over 100,000 practicing dentists and thus fails to warrant much less justify OSHA's all-protective and all-encompassing rule.
 
 
 41
 OSHA, in its questionable quantitative risk assessment, perhaps in an attempt to enlarge its sphere of influence or as a result of responding to well-organized political pressure, failed to analyze and weigh the varying risk levels among respective disciplines (dentists, home health, surgeons, etc.) when determining significant risks for HBV infection due to the lack of epidemiological data relating to the individual disciplines. 56 Fed.Reg. at 64023-64032. To fill this void, OSHA chose to rely on those CDC statistics that it deemed helpful in determining the annual and lifetime risk levels for HBV infection in the health care field as a whole. Id. at 64026 ("Of the 280,000 HBV infections each year (based on 1988 Hepatitis Surveillance data), CDC estimates that 8,700 cases occur in health care workers with occupational exposure...."). OSHA's use of the HBV statistics is highly suspect in that they merely relied on an estimate of the number of infected health care employees rather than determining the number through a scientific survey. Without the use of these speculative statistics, OSHA would in all probability have been unable to establish compelling results to satisfy the significant risk requirement in either the dental or the home health disciplines.
 
 
 42
 OSHA's decision to ignore varying risk levels in the respective health care disciplines appears to be nothing but a scheme to achieve a desired result for the sake of "administrative convenience." See International Union, 938 F.2d at 1322. The failure to analyze, quantify, and document the data on the particular risk factors the dental, home health, and temporary medical services individually might incur vis-a-vis the other identified health care sectors results in a quagmire of highly suspect estimates of the risk of HBV infection in the appellants' disciplines. OSHA, as have others before, demonstrated the truth of the well-known saying that people can use statistics to make any point they want. Above all, this type of "reliance on overbroad categories denie[s] [industries] adequate protection" from overreaching regulation. See id. OSHA conceded the effect of International Union when it stated, "[that case] stands only for the proposition that OSHA must consider any record evidence that shows a wide variation in incident rates among industries in deciding whether to regulate on an aggregated basis." OSHA Brief at 17. Because of the established "wide variation in incident rates" of exposure to bloodborne pathogens, OSHA, if it was in fact attempting to achieve accuracy, should have disaggregated the individual disciplines in determining the existence of a significant risk.
 
 
 43
 The professional training the vast majority of health care workers undergo in infectious disease prevention, in addition to complying with the CDC Guidelines, and the respective state and professional regulations are more than an adequate safeguard to combat the minimal risk of infection existing in a dental office or home health care place of employment. On October 28, 1991, Congress enacted a law requiring that states adopt and enforce the 1991 CDC guidelines. See Pub.L. No. 102-141, 105 Stat. 876, § 633 (1991). Because of the Supreme Court's ruling in Gade v. National Solid Wastes Management Ass'n, --- U.S. ----, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992), the OSHA regulations preempt any comparable state regulations, i.e., the 1991 CDC guidelines. Interestingly, the CDC guidelines are patient oriented as contrasted with the OSHA rule which is employee oriented.
 
 
 44
 The OSHA rule leaves much question in light of the fact that the dentists and their support staff are well-trained during their respective dental educational programs as well as their continuing professional dental seminars in how to prevent and control exposure to infection but at the same time the consumer-patient is not as fortunate and is thus uninformed as to both the risk and the techniques or methods of prevention. Rather than having the CDC and OSHA rules conflict with one another, resulting in confusion as well as government waste from duplication of effort, one governmental organization should be drafting and be responsible for enforcing a logical, scientifically acceptable, cost-conscious rule which would in turn protect not only the medical and dental personnel but the consumer-patient as well.
 
 
 45
 I understand that OSHA did consider some of the Dental Association's concerns, see, e.g., 56 Fed.Reg. at 64103 (addressing the ADA's argument that saliva should not be included in the standard), but in large part this pro forma treatment of challenges to the standard was inadequate. OSHA did not specifically find that dentists and home health workers were exposed to risk anywhere near a level that could be labeled significant.
 
 III. SIGNIFICANT BENEFITS
 
 46
 Benzene states "that Congress intended, at a bare minimum, that [OSHA] find a significant risk of harm and therefore a probability of significant benefits before establishing a new standard" and requires that the Occupational Safety and Health Administration find that "a place of employment is unsafe--in the sense that significant risks are present and can be eliminated or lessened by a change in practices." Benzene, 448 U.S. at 642, 645, 100 S.Ct. at 2864-65.[11] The starting point for this significant risk analysis should be the current state of regulation and the risks present thereunder based on recognized and accepted empirical data. OSHA admittedly did not consider the present state of regulation including the CDC Guidelines adopted by the states,[12] other individual state and professional regulations, and the increased use of HBV vaccinations in the dental profession (71% of the nation's roughly 100,000 dentists are vaccinated, while 41% of the nearly 5 million health care workers in the entire health care profession are vaccinated, 56 Fed.Reg. 64027, 64092). OSHA Brief at 20. OSHA acknowledges that the HBV vaccination is 96 percent effective, id. at 64027, and "[t]he risk of HBV infection is most efficiently and dramatically reduced by vaccinating all workers exposed to blood and other potentially infectious materials." Id. at 64036. Therefore, mandating HBV vaccination for all health care personnel insures far greater reduction of risk at a minimum of expense than do the requirements of wearing shoe covers or thirty-year record keeping, etc. I certainly do not oppose the reasonable recognized safeguards including but not limited to the use of goggles, gloves, masks, sterilization and waste disposal in a hospital setting.[13] However, I fail to understand the need for separate and distinct governmental agencies to regulate the same subject matter particularly when the CDC is so eminently qualified through its knowledge, expertise, professional personnel, and continued research combined with its experience. The Supreme Court has held that a "rule is arbitrary and capricious if the agency ... entirely failed to consider an important aspect of the problem." Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). In my opinion, the failure of OSHA to take cognizance of the effectiveness and implementation of current state and federal (CDC) regulation and guidelines (including HBV vaccination statistics) leads to but one conclusion, that the final rule can and must be classified as arbitrary and capricious.
 
 
 47
 Above all, regulation of this type is just one more example of governmental waste. The much maligned health care field and its insurance systems are struggling and almost bankrupt partially because of excessive and unnecessary regulations of this nature that are not only duplicative but are also less than cost efficient. OSHA further exacerbates the health care crisis when it enters into the fields of medicine, and dentistry, and related support staff, where it falls short of being either qualified or experienced to exercise regulatory oversight. My concerns about the inefficiency of having another federal agency regulate dentists and home health employees applies with equal force to the other health care disciplines covered by the rule though they are not party to this suit. OSHA's regulation of doctors' offices (at a cost of $144 million annually) and hospitals ($322 million) will merely duplicate the educational, investigative and research efforts of the CDC, state health agencies, hospital associations and professional organizations. This regulation upon regulation only serves to exacerbate the skyrocketing costs of health care in America.
 
 
 48
 I disagree with my two colleagues, who are both properly recognized and respected as experts in the field of economics as well as law, but who have overlooked the lack of marginal benefit in the final rule. The majority maintains that OSHA "is not authorized to ... compare the benefits with the costs and impose the restrictions [the Bloodborne Pathogens Standard] on finding that the former exceeded the latter." Op. at 825 (citing 29 U.S.C. § 655(b)(5); Benzene, 448 U.S. at 642-45, 655-56, 100 S.Ct. at 2864-65, 2870-71; Cotton Dust, 452 U.S. at 509, 530-36, 101 S.Ct. at 2490, 2500-04). Accordingly, OSHA only examined "whether the restrictions would materially reduce a significant workplace risk to human health without imperiling the existence of, or threatening massive dislocation to, the health care industry." Op. at 825. As I have previously mentioned (see supra at 833), the Supreme Court has recommended that OSHA pursuant to § 3(8) of the Act, consider drafting the less costly of two equally effective proposals: "the 'reasonably necessary or appropriate' limitation might come into play as an additional restriction on OSHA to choose the [least costly regulation]." Cotton Dust, 452 U.S. at 514 n. 32, 101 S.Ct. at 2493 n. 32. Moreover, I am aware of no rule barring OSHA's applying reasonable judgment and fiscal responsibility. OSHA should have taken into consideration that a qualified governmental agency with a wealth of medical and scientific expertise was already responsible for the health care profession and thus OSHA could not hope to accomplish anything that the CDC was unable to achieve more effectively. (Perhaps this could be achieved by congressional action giving the CDC the same inspection and enforcement powers as OSHA). Furthermore, had OSHA considered and analyzed the marginal costs and benefits of its regulations as applied to the dental, home health care and personnel services professions, they would have foregone promulgation of the rule, because less costly, less intrusive regulations are available and have effectively reduced the risk of exposure to bloodborne pathogens.
 
 
 49
 In OSHA's explanation of why the regulation is warranted, it admits: "The risk of HBV infection is most efficiently and dramatically reduced by vaccinating all workers exposed to blood and other potentially infectious materials." 56 Fed.Reg. 64036. Yet, in spite of the finding that vaccination is the most efficient preventative measure, rather than making vaccination mandatory, the government, through OSHA, proceeded to create the present bureaucratic rule which will magnify the costs of health care by over $800 million annually to consumers based upon the weak excuse that "not everyone is willing to accept the vaccine." Id. at 64037. The majority maintains that "the vaccine is not a hundred percent effective and, more important, ... many health care workers refuse to be vaccinated." Op. at 825-26. While there are a certain number of people who refuse to be vaccinated, this certainly is not a valid reason to reject mandatory vaccination of health care workers. Thus, this argument can best be classified as a red herring. To realize that vaccinations are a reality in this day and age, one need only look to the infant children who must and do receive vaccinations before entering school and when not vaccinated are refused admission to attend classes. Other examples of compliance with mandatory vaccination programs include those traveling abroad who are denied visas or entry into certain foreign countries and the over two million men and women in the armed services. The vast majority of dental schools are requiring proof of vaccination before accepting incoming students as is evidenced by the increase in the percentage of incoming dental students who have received HBV vaccination from fifty-one percent in 1986 to eighty-six percent in 1988, and among dental hygiene students from sixty percent in 1986 to eighty-five percent in 1988. Appendix to OSHA Brief at 44 (citing V. Merchant & J. Molinari, The Current Status of Infection Control in North American Dental Schools 9 (Mar. 14, 1989)). For reasons unknown and contrary to sound medical judgment and research, OSHA concluded that even though vaccinations would reduce almost all risk of health care professionals becoming infected by HBV, the additional, far more expansive, impractical and cost inefficient precautions were necessary. Id. at 64036-38. In part, OSHA justified the need for the entire bloodborne pathogens standard because it "will also reduce[e] the risk of infection to HIV." Id. at 64038. This rationale is neither scientifically nor medically established and is thus arbitrary and capricious and falls far short of being supported with substantial evidence because OSHA itself concedes "there are no sufficient data on HIV to quantify the occupational risk of infection." Id. (emphasis added). OSHA should not be allowed to impose on the health care industry, during these times crying for fiscal responsibility, a rule whose benefits and safeguards could be achieved through a far more cost effective and efficient means (mandatory vaccination) both to the consumer and the government alike. See Cotton Dust, 452 U.S. at 514, n. 32, 101 S.Ct. at 2493, n. 32 (suggesting that the "reasonably necessary or appropriate" language of § 3(8) might require OSHA to select the less expensive of two equally effective measures).
 
 
 50
 OSHA's fatal error, in my opinion, occurred when it failed to recognize and consider the varying risk of occupational exposure in the respective appellants' professions. "Infected [health care workers] who adhere to universal precautions and who do not perform invasive procedures pose no risk for transmitting HIV and HBV to patients." Centers for Disease Control, 40 MMWR 1, (July 12, 1991) (emphasis added). Dentists, for example, are not exposed to the same level of risk as other health care workers such as surgeons, nurses or other medical personnel in large metropolitan hospital's emergency or operating rooms, just as cotton gin workers are not exposed to the same risk as are other cotton industry employees. A large number of dentists both in general practice and in a number of specialties, unlike surgeons in hospital settings, have little exposure to blood. See ADA Brief at 10.[14] Despite the testimony of over 400 witnesses and an additional 3000 written comments, before this court, OSHA relies on but one single 1988 article (Infection control recommendations for the dental office and the dental laboratory, 116 J.A.D.A. 241 (Feb.1988)) to support its claim that dental workers are at risk of acquiring HBV. OSHA Brief at 18. The article fails to take into account the most recent safeguard innovations such as the increased use of the HBV vaccine by the dental and medical professionals, and the implementation of recent CDC Guidelines.[15] OSHA argues that having to conduct a significant risk analysis for each industry would hamper its ability to regulate.[16] This is another example of OSHA's less than scientific approach to drafting this rule, for I firmly believe that in the interest of fairness to the professions it is incumbent that OSHA undertake a thorough risk analysis and not merely rely on estimates. Moreover, OSHA's argument that its rule making will be hampered is undermined by the fact that much of the statistical material (including the research necessary to produce a significant risk analysis) was either in the hands of or readily available to OSHA.
 
 
 51
 OSHA attempts an end run around the significant risk/benefit issue by arguing that the dental industry does not have a "zero risk" (and I might add who does--the unregulated barber, the cosmetologist?). This argument is without merit because it completely disregards and casts aside the burdens established in Benzene. Benzene requires OSHA to make a finding that the employees to be regulated are exposed to a significant risk. 448 U.S. at 642, 100 S.Ct. at 2864. Benzene does not require that the appellants establish a "zero risk" in their professions. There may well be a danger of transmitting infection in the dental and home health environments but it is neither scientifically nor medically established in the record before us. Therefore, if Congress fails to intervene, the reasoned and proper judgment of the court should as a last resort be to remand the final bloodborne pathogens standard to OSHA with directions to determine whether a significant risk exists when considering the various appellants' professions individually. OSHA must also determine and explain whether the final rule results in significant benefits through the use of recognized empirical data.
 
 
 52
 IV. PROTECTION FOR THE EMPLOYEE BUT NOT THE PATIENT
 
 
 53
 The appellants also argue that the OSHA regulations fail to consider the very important interests of the consumer-patient in knowing whether his health care provider is infected with a bloodborne disease thus permitting the patient to make an informed and reasonable judgment as to whether they wish to discontinue treatment with the infected practitioner or a member of his staff. The appellants stress that the CDC Guidelines, while not requiring health care workers to be tested for viruses, do require (relying on the honor system) that infected workers report to a health care committee for recommendation as to whether they may perform invasive procedures. The CDC Guidelines also properly recommend that infected health care workers inform patients of their infected status before performing invasive procedures:
 
 
 54
 "HCWs who are infected with HIV or HBV ... should not perform exposure-prone procedures unless they have sought counsel from an expert review panel and have been advised under what circumstances, if any, they may continue to perform these procedures. Such circumstances would include notifying prospective patients of the HCW's sero positivity before they undergo exposure-prone invasive procedures."Centers for Disease Control, 40 MMWR 5, (July 12, 1991) (emphasis added) (footnote omitted).[17]
 
 
 55
 I am well aware that many individuals in the medical community oppose disclosure of a health care professional's HIV status. I disagree with their point of view for I believe the consumer-patient's interest is paramount for he or she is entitled to be made aware of this information in order that they might make an informed health care decision before undergoing any medical or dental procedure (if indeed there is a risk of HIV or HBV infection as OSHA contends). A primary reason many medical professionals oppose disclosure is that they are interested in protecting their fellow professionals whose practices might decline or cease to exist if patients knew their physician or treating health care worker was afflicted with an infectious disease. This practice is contrary to the response the medical community and public health officials take toward infected food workers (requiring medical treatment and prohibiting employment, see infra at 843). The opposition to disclosure does not stem from a concern for the consumer-patient who merely seeks to make an informed health care decision.
 
 
 56
 I understand OSHA's congressionally delegated responsibility is to protect employees, in doing this however, OSHA completely cast aside the interest of the consumer-patient and focused exclusively on the confidentiality interests of the health care employees. OSHA rationalizes this by stating that confidentiality of records will encourage employees to report exposure incidents (I disagree that it will encourage reporting but it might conceivably make employees somewhat less inhibited to report exposures). 56 Fed.Reg. 64160. After an "exposure incident"[18] to patient blood or other potentially infectious material like saliva,[19] the rule requires employers to provide confidential blood testing from a health care professional for their employees. Importantly, in § 1910.1030(f)(5)(ii) of the bloodborne pathogens standard "the healthcare professional's written opinion for post-exposure evaluation and follow-up shall be limited to the following information:
 
 
 57
 "(A) that the employee has been informed of the results of the evaluation; and
 
 
 58
 "(B) that the employee has been told about any medical conditions resulting from exposure to blood or other potentially infectious materials which require further evaluation or treatment.
 
 
 59
 "(iii) All other findings or diagnosis shall remain confidential and shall not be included in the written report."
 
 
 60
 Bloodborne Pathogens Standard § (f)(5)(ii)-(iii) (emphasis added).
 
 
 61
 In the record-keeping section, the final rule states:
 
 
 62
 "(h)(1)(i) The employer shall establish and maintain an accurate record for each employee with occupational exposure, in accordance with 29 C.F.R. 1910.20....
 
 
 63
 "(iii) Confidentiality. The employer shall ensure that employee medical records required by paragraph (h)(1) are:
 
 
 64
 "(A) Kept confidential; and
 
 
 65
 "(B) Are not disclosed or reported without the employee's express written consent to any person within or outside the workplace except as required by this section or as may be required by law."
 
 
 66
 Id. § (h)(1)(i)-(iii).
 
 
 67
 The meaning of the language "as may be required by law" is indefinite, yet OSHA argues that § (h)(1)(iii)(B) permits disclosure of employee records as required by state law (inferring patients somehow may be able to acquire information necessary to granting informed consent). Interestingly though, even if the record is open to inspection as OSHA alleges, the record fails to contain any information dealing with the employee's infection status (positive or negative), because § (f)(5)(b)(iii) of the bloodborne pathogens standard prohibits the employee's health record from revealing such information. This rule denying the consumer-patient valuable information flies directly in the face of the professional norms in the health care industry (which is bound by the common law of informed consent)[20] and defies objectivity, fairness and common sense.[21]
 
 
 68
 The courts have long recognized the right of a patient to determine what medical procedures he or she will undergo, see, e.g., Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261, 277, 110 S.Ct. 2841, 2851, 111 L.Ed.2d 224 (1990); Schloendorff v. Society of New York Hosp., 211 N.Y. 125, 105 N.E. 92, 93 (1914); and therefore a health care professional may not deny information relevant to making an informed decision as to a medical or dental procedure. Lieberman & Derse, supra note 17 at 342 (citing Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees, 154 Cal.App.2d 560, 317 P.2d 170, 181 (1957) ("A physician violates his duty to his patient ... if he withholds any facts which are necessary to form the basis of an intelligent consent.... Likewise, the physician may not minimize the known dangers of a procedure or operation in order to induce his patient's consent.")).
 
 
 69
 The confidentiality provision also conflicts with a dentist's ability to prudently and effectively manage his office. State statutes permit a health care provider to inform his staff assisting him in providing care to a patient if that patient is HIV positive to ensure extra precaution. See, e.g., Ill.Ann.Stat. ch. 111 1/2 para. 7309(c) (Smith-Hurd 1988); Wis.Stat.Ann. § 146.025(5) (West 1989). So too should a dentist, physician, surgeon, hospital administrator or other health care professional be entitled to know whether an employee in his office is infected, thus presenting a risk to himself as well as his patients, or fellow employees by exposing them to the risk of infection during a procedure. Certainly it cannot be labeled discrimination when enacting rules and/or regulations that prevent one with a communicable virus from spreading that infectious virus to an uninformed, trusting consumer. See Americans with Disabilities Act 42 U.S.C.A. § 12113(b) (West Supp.1992) ("The term 'qualification standards' may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.").[22] Public health officials, when informed, have the responsibility to see that a food worker infected with either the hepatitis A virus or the tuberculosis virus is barred from employment in all aspects of the food industry. Id. § 12113(d). Do not justice and logic dictate that the same measures be taken to prevent a health care employee with a bloodborne virus from exposing a patient to infection? Does not the consumer have at least equal rights to protection against infection as the health care provider has? It is evident that the quagmire of regulations from OSHA, the CDC, state agencies and professional organizations yield a confusing morass of conflicting intentions, goals, rules and regulations.
 
 
 70
 The root of much of this dispute is a vocal minority's emphasis on the rights of the individual at the expense of the common good of all. The defeat of the congressional attempt to require mandatory testing of health care workers can only be explained by powerful lobbying efforts. See generally William B. Rubenstein, Law and Empowerment: The Idea of Order in the Time of AIDS, 98 Yale L.J. 975, 993-94 (1989) (book review discussing impact of lobbyists). It is incumbent upon Congress to address and take an in-depth look at the AIDS problem and achieve a balance that reflects the paramount interest of all mankind and not let the overriding concern be with the individual's right of privacy.
 
 
 71
 Additionally, OSHA is attempting to regulate a "toxic substance" (human blood) which is unique from all other areas of OSHA regulation yet it lacks the required expertise, knowledge or experience in the highly specialized field of health care to evaluate the necessary scientific, medical, and/or dental data. See, State of Wisc., Dep't of Health v. Bowen, 797 F.2d 391, 412 (7th Cir.1986) (Coffey, J. dissenting) ("Nameless, faceless, lay government officials have neither the knowledge of the patient's needs, the medical training, nor the authority to" intrude into medical and dental procedures.). OSHA was originally created to protect the workers in the factory and construction environments and, as a result of knowledge and experience is well-equipped to regulate those industries, but I have very serious doubts about their qualifications to monitor the health care field, including but not limited to dentists, doctors and hospitals. See OSH Act of 1970, P.L. 91-596, 1970 U.S.C.C.A.N. (91 Stat.) 5177, 5178-81 (discussing industrial risks and never mentioning the health care profession). I suggest that the Congress reexamine OSHA's role in regulating the highly technical health care sector and see if that area might better be served by an agency or agencies possessing the required expertise in the discipline, such as the Centers for Disease Control in the Department of Health and Human Services and the respective qualified state controlled agencies and professional organizations. The CDC has been investigating, compiling data, and dealing with the health risks in the workplace for years and in turn disseminates its findings as well as this vital health care information throughout the nation. State health agencies frequently use this information along with the CDC guidelines to aid in the states' regulation of the health care profession. Because the states have the capability of contemporaneous oversight and timely inspections, they have traditionally regulated health care, and thus have acquired a tremendous amount of experience and expertise in the field. Consequently, it is both unnecessary and wasteful for OSHA to usurp the functions of the CDC and the states in health regulation. Having OSHA defer to the CDC and state health agencies when regulating health care is similar to the government's leaving nuclear regulation to the Nuclear Regulatory Commission, (it would be absurd for the inexperienced OSHA inspectors to regulate the nuclear workplace environment and the employees of power plants, arms production or nuclear waste facilities). I am of the opinion that allowing OSHA inspectors, who lack the necessary knowledge and expertise, to regulate and intrude into the highly technical medical procedures of the 20th and 21st centuries is at best extremely suspect.
 
 
 72
 In a typical workplace, such as a factory, government regulation limits an employee's exposure to toxic materials like lead or asbestos. These regulations are designed to benefit the worker only and not impact third parties. In reality though, there is an indirect impact on the consumers who are required to pay the higher price for the product affected by the unnecessary piling on of needless and ineffective regulations on top of regulations. In the health care field, however, the third party (the innocent uninformed consumer-patient) is directly exposed and impacted by the regulations with possible fatal consequences (according to OSHA). For this reason, OSHA, in the exercise of logic, common sense and fairness should have also considered the interest of the patient and sought to protect the consumer-patient from possible harmful exposure to bloodborne viruses. Because the final rule fails to consider the health care consumer, it is flawed and cries out for judicial and/or congressional intervention to weigh and balance the documented concerns and protect the innocent and uninformed health care consumer as well as the employees.
 
 
 73
 Further evidence that the regulations fail to consider the preeminent interests of patients is found in the excessive record keeping requirements imposed on health care employers (thirty years beyond an employee's tenure with the employer).[23] This thirty-year record keeping requirement will have little or no impact on reducing the spread of infectious diseases in the health care industry, rather it merely creates another administrative nightmare and increases the already prohibitive cost of purchasing medical and dental services. OSHA estimated the annual cost of record keeping alone to be in excess of $17 million. 56 Fed.Reg. 64064. This figure, in all probability, fails to include costs for increased clerical needs, storage facilities or the time of health care professionals interfering with patient care and valuable research. Despite well-supported objections to the thirty-year record keeping requirement, OSHA cavalierly concluded:
 
 
 74
 "that this provision is neither excessive nor impractical when viewed from the perspective of the employee. Vaccination records are an essential part of an employee's medical history. OSHA believes that retention of these records and exposure incident records is necessary to assist current and future health care professionals in assessing an employee's medical history and prescribing medical treatment."
 
 
 75
 56 Fed.Reg. at 64171. This reasoning lacks concern for the provider as well as the consumer-patient who bears the cost without a recognizable benefit.
 
 
 76
 Viewing this provision as applied to temporary services reveals its true absurdity. Because many temporary medical personnel serve more than one temporary services employer (often for less than a week and sometimes for but a day), each employer is required to incur the added expense of maintaining and storing duplicative records of each employee for a period of thirty years. This requirement could have been eliminated or more properly transferred by placing the responsibility on the employee. Requiring health care employees to carry a health card revealing recorded vaccinations, known exposure incidents and any other pertinent information would eliminate a large portion if not the majority of the estimated $17 million in paperwork and poses no more burden on an employee than carrying a drivers license, a permit, social security card, or charge card. Moreover, it is in the employee's best interests to have this vital information in record form in his or her possession in case of medical emergency or future employment. As the majority maintains, the profession could regulate itself because "health care workers have a stronger incentive than the government to protect themselves from health hazards at a reasonable cost...." Op. at 826. The regulation, however, reflects an agency decision to make society bear the costs of individuals who do not want to be inconvenienced. OSHA, for reasons unexplained in this record, ill-advisedly chose to impose the costs for medical records of employees (who allegedly do not want to be inconvenienced by vaccinations or maintaining personal vaccination records) on the already financially strained health care consumer.
 
 V. FEASIBILITY
 
 77
 Section 6(b)(5) of the OSH Act requires that final regulations be feasible. The figures that OSHA used to conduct the feasibility analysis were flawed resulting in a misleading and foundationless economic picture. I agree that the cost effects of the final rule are understated as the majority observes. Op. at 825-26 (discussing understated "time costs"[24] of compliance and the number of lives the rule will save). Additionally, a significant oversight in the feasibility analysis is that the majority of dental patients directly pay for their own dental expenses due to the limited coverage of dental insurance and its high cost. Therefore, dentists will in all probability be unable to pass on the costs of complying with the rule as readily as doctors or hospitals (who serve a greater percentage of patients with insurance coverage), because patients without insurance will defer or forego dental treatment rather than pay the higher cost. ADA Brief at 38-39; OSHA appendix at 46. Obviously, dental practitioners, like businessmen, either absorb the costs or pass them on to their patients. In an era of decreasing demand for dental services (dental school closings result in fewer dentists practicing, H. Barry Waldman, Dental School Demographics: More than Just Decreases in the Overall Number of Students, 57 J.Am.Coll.Dentists 22 (1990)), the vast majority of dentists should not be put in the position of having to bear additional costs of unnecessary governmental regulation. The combination of fewer practicing dentists along with the impact of the OSHA rule can only produce an increase in fees for dental services. The majority mentions that OSHA and the Dental Association have "ignored" the "time costs" of the rule. Op. at 827-28. I would not classify the Dental Association's brief as ignoring the time cost (Appellants Brief at 40-41) but I agree they failed to quantify and itemize those costs. Nonetheless, the consumer will ultimately bear the burden of the increased costs of providing dental services.
 
 
 78
 Another example of the flawed feasibility analysis is that OSHA failed to include disposal costs of non-reusable personal protective equipment (PPE) or laundry costs for reusable PPE. 56 Fed.Reg. 64065 (OSHA includes no cost for laundering reusable gowns and only $.32 per dental office as the annual cost of bags for disposable gowns and PPE). In 1987, the CDC stated "[a]lthough soiled linen has been identified as a source of large numbers of certain pathogenic microorganisms, the risk of actual disease transmission is negligible. Rather than rigid procedures and specifications, hygienic and common-sense storage and processing of clean and soiled linen are recommended." CDC, 36 MMWR at 11S (August 2, 1987). Despite this CDC finding concerning laundry, OSHA has created stringent laundering regulations. 56 Fed.Reg. 64178. The ADA has estimated the annual cost of laundering reusable PPE at $115 million[25] which exceeds all the costs of compliance with the regulations that OSHA identified for the whole dental profession.[26] OSHA responds that because of the high costs of laundering, most dental practitioners would decide to employ disposable protective equipment. For some reason, OSHA failed to factor in the costs of storing and disposing of such waste but should have for I know of very few dental practitioners with an incinerator or the facilities to store and transport infectious waste to an incinerator in their respective office buildings. 56 Fed.Reg. 64065. Additionally, OSHA estimated the cost of a disposable gown at $.32 while the ADA estimates the actual cost of a fluid resistant gown is $2.50. OSHA appendix at 64.[27] These oversights certainly call into question whether the rule is supported by substantial evidence.[28] I disagree with the majority that the omitted costs, such as the thirty-year record-keeping and laundering requirements, are "not enough to make a decisive difference." Op. at 829. Only a complete and accurate feasibility study will determine whether the rule is warranted.
 
 
 79
 Regarding the temporary medical personnel services, the feasibility analysis is likewise misleading. OSHA calculated an annual turnover rate among registered nurses between 12.9 and 21.8 percent and among licensed practicing nurses and nurses aides between 22.5 and 36.3 percent. The temporary services sector, however, has turnover rates from three to five times greater than the rest of the profession. HHSSA appendix at 2 (testimony of James Keefe, Sept. 21, 1989, on bloodborne pathogens standard, Exhibit 55). Many temporary service employees work as briefly as one week for an employer and the majority are employed by the same employer for less than six months. Id. Such a disparity in turnover rates certainly negates the accuracy of OSHA's feasibility analysis and calls into question the validity of the rule as applied to the temporary services field.
 
 
 80
 Finally, OSHA fails to enumerate how it intends to enforce this standard. Do they intend to invade the privileged relationship between a doctor and/or dentist and his or her patient? Do they intend to hire thousands of new inspectors to enforce this rule? We now have over three million civilian federal employees--do we need more? Are they going to transfer the inspection responsibility to the states along with all the enforcement expense? Do they expect voluntary compliance which all too frequently results in universal disregard for the law?
 
 VI. CONCLUSION
 
 81
 I am cognizant of the need for dental and medical regulations and safeguards to insure and prevent the spread of infection, but fail to understand why OSHA must assert authority over the health care field when it lacks the required medical knowledge, training, and experience, much less expertise. In the absence of proof that the CDC Guidelines are inadequate, any regulation by OSHA is unnecessarily duplicative of CDC efforts and merely serves to increase health care costs with little if any corresponding benefit. Moreover, OSHA's method of attempting to satisfy the significant risk standard was less than desirable. OSHA should have disaggregated each of the health care disciplines, in particular, the larger ones, including hospitals (2.3 million employees), physicians' offices (640,000 employees), and dental offices (316,000 employees) (see supra note 5 listing the twenty-four sectors covered by the rule), in order to accurately determine if a significant risk of exposure exists in the particular field and whether the rule results in significant benefits to the particular discipline. Combining the millions of health care workers into one group and then merely relying on estimates of risk is a less than acceptable manner of regulating the nearly five million health care workers in this country.
 
 
 82
 The majority dismisses out of hand several valid ADA arguments, maj. op. at 12, such as the burden of the thirty-year record-keeping requirement, costs of laundering and difficulties of complying with the post-exposure procedures. I have attempted to address some of these issues in order to present a more complete analysis should Congress decide to take an in-depth look at this problem to determine if OSHA should exercise its authority in the same realm as the CDC and the State health agencies. If Congress concludes there is a need for two federal agencies--in addition to state agencies and professional organizations--to exercise oversight in the health care field, then Congress must acknowledge their responsibility for increasing the cost of health care.
 
 
 83
 Should Congress after due deliberation and debate express its desire for more regulation of health care, then OSHA, with the exercise of proper judgment, could draft a very concise regulation designed to protect employers, employees and patients and segregate the different areas of health care. The most effective and cost-efficient regulation would be to require HBV vaccinations for all health care workers at risk of exposure in the United States, and to enforce existing state regulations, the 1991 CDC Guidelines (requiring universal precautions), and the OSHA general personal protective equipment rules. 29 C.F.R. 1910.132(a). Such a rule would eliminate nearly any potential of a health care worker contracting an infectious disease in the workplace as well as demonstrating proper fiscal responsibility on the part of the government. As previously mentioned, OSHA itself acknowledges that HBV vaccinations are 96 percent effective at preventing infection. Not only would such a rule be far more effective than the proposed rule, the costs of this regulation would be dramatically reduced from that proposed by OSHA.
 
 
 84
 There is no need for four separate entities (OSHA, CDC, state agencies, and professional organizations) to regulate the health care industry based on one suspected case of a dentist becoming infected with HIV through work related exposure. One qualified entity can most effectively and efficiently regulate the health care profession. I see no reason why the respective states are unable to continue to regulate the medical and dental profession as the states have traditionally done in the past and presently do in many other professional fields including but not limited to law, engineering and architecture.
 
 
 85
 "It is elemental that a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there. It is a vital part of a state's police power. The state's discretion in that field extends naturally to the regulation of all professions concerned with health."
 
 
 86
 Barsky v. Board of Regents, 347 U.S. 442, 449, 74 S.Ct. 650, 654, 98 L.Ed. 829 (1954), see also State of Wisc., Dep't of Health v. Bowen, 797 F.2d 391, 413 (7th Cir.1986) (Coffey, J. dissenting). Furthermore, OSHA may be highly qualified to regulate everything from construction and manufacturing to the foundations of the high trapeze act in the circus, but I am of the opinion that as presently constituted it is unqualified to regulate the fields of medicine and dentistry and their supporting staffs.
 
 
 87
 Finally, there is little doubt that lobbyists and the media in all probability have greatly impacted OSHA's rule making. Sadly, while billions of dollars are and will be spent enforcing OSHA's bloodborne pathogen standard as presently drafted (merely duplicating the research and oversight of other qualified agencies), these same funds could be more wisely expended to aid the millions of Americans who continue to die from the nation's three leading killers (heart disease, cancer, and stroke) as well as AIDS and other diseases.[29]
 
 
 
 [1]
 Medical experts have to date been unable to scientifically determine how the dentist, David Acer, infected his five patients. It has been reported that he may have intentionally infected them. Unfortunately, if it was in fact a criminal act, no amount of precaution could have prevented it. See, e.g., AIDS Infection Charge, Wash. Post, June 11, 1992 at A12
 
 
 [2]
 The rule making process actually began with a petition in 1986 from the American Federation of State, County and Municipal Employees requesting OSHA to reduce the risk to employees from infectious agents. 56 Fed.Reg. 64006 (1991). Soon thereafter, other unions (Service Employees International Union, National Union of Hospital and Healthcare Employees, RWDSU Local 1199--Drug, Hospital and Healthcare Union) also requested a rule. Id
 
 
 [3]
 OSHA states that during its regional hearings, it analyzed the testimony and information of some 400 witnesses plus 3000 written comments. 56 Fed.Reg. 64008. For reasons unexplained, OSHA decided to address the entire health care industry (combining disciplines with hundreds of thousands of individuals in diverse and unrelated fields as well as joining together both rural and metropolitan areas, see infra note 5) rather than addressing the risk of exposure to bloodborne pathogens in their unique and respective disciplines. As a result, the cumbersome 174 page rationale for the rule in the Federal Register can be digested and analyzed with only the greatest of difficulty
 
 
 [4]
 The sectors of health care workers OSHA investigated include physicians and surgeons, registered nurses, therapists, lab technicians, emergency medical technicians, surgical technicians, other health professionals, licensed practical nurses, therapy assistants, physician assistants, medical assistance, nursing aides, dentists, dental hygienists, and dental assistants
 
 
 [5]
 The 24 industry sectors include: offices of physicians (including ambulatory medical services), dental offices, hospitals, medical and dental laboratories, nursing homes, residential care facilities, dialysis centers, drug treatment centers, home health care, hospices, government outpatient facilities, blood collections and processing, health clinics and industrial facilities, personnel services, funeral homes and crematories, research laboratories, linen services, medical and dental equipment repair, law enforcement, fire and rescue, correctional institutions, schools, lifesaving, and regulated waste removal. 56 Fed.Reg. 64041
 
 
 [6]
 OSHA also considered those non-healthcare workers who might incur occupational exposure to blood (including janitorial, laundry and school workers) to have risk similar to health care professionals. "Therefore OSHA will use the data available for health care workers with occupational exposure to predict the HBV infection risk to any worker with occupational exposure to blood or other potentially infectious material." 56 Fed.Reg. 64026. OSHA combined the non-healthcare worker with the trained professional health care worker but disregarded the fact that the non-healthcare worker may not have had any training in infection prevention as contrasted with medical and dental professionals who have had training during their respective scholastic endeavors plus follow-up seminars. Interestingly, in an area where I agree OSHA might well have the required expertise, the rule does not govern barbers and cosmetologists, where cleanliness should be mandated but is not always the rule. Barbers and cosmetologists when using sharp instruments (including razors and scissors) are exposed to their clients' blood as well as exposing clients to their own blood, more frequently than many other disciplines governed by this rule. The frequency of a barber or tonsorial employee inadvertently drawing blood from a customer warrants greater consideration of the likelihood of spreading infectious viruses like HBV and HIV than does a professional in a one-chair dental office in a rural community, an orthodontist, or one who practices in a specialty where laceration or puncturing of the gum tissue is the exception
 
 
 [7]
 There are other examples of OSHA excluding specific sectors from a rule. See 29 C.F.R. §§ 1910.1001(a)(1)-(2), 1910.1025(a)(2) (asbestos, tremolite, anthophyllite, actinolite, and lead exposure rules); 29 C.F.R. § 1910.1018(a) (inorganic arsenic exposure rule); 29 C.F.R. § 1910.261(a)(1) (pulp, paper, and paperboard mill regulation)
 
 
 [8]
 The ginners numbered at most 58,968 employees (calculation based on 21 employees for each of 2808 cotton gins in the U.S., this number is probably quite high since many ginners work at more than one gin during the season). 43 Fed.Reg. 27427 (1978). The total number of employees affected by cotton dust was somewhere between 420,000 and 800,000. American Textile Mfrs. Institute, Inc. v. Donovan, 452 U.S. 490, 500, 101 S.Ct. 2478, 2485, 69 L.Ed.2d 185 (1981); AFL-CIO v. Marshall, 617 F.2d 636, 646 (D.C.Cir.1979)
 Another example of OSHA drafting rules for a particular segment of industry is the promulgation of rules to cover only those 8,136 employees in the underground construction industry, 54 Fed.Reg. 23824, 23846 (1989), 67,728 employees affected by ethylene oxide, 53 Fed.Reg. 11,414, 11,421 (1988), 69,000 (OSHA estimate) loggers, 54 Fed.Reg. 18,798, 18,810 (1989), and 145-180,000 shipyard employees, 53 Fed.Reg. 48,150, 48,162 (1988).
 
 
 [9]
 313,219 of those employees are dentists, dental hygienists or dental assistants who have received training in infectious disease control. The remainder are housekeepers or provide janitorial services in dental offices. See 56 Fed.Reg. 64043
 
 
 [10]
 The dentist denied having other risk factors for AIDS (such as intravenous drug use) but OSHA stated "other modes of transmission cannot be ruled out." 56 Fed.Reg. 64017, 64019
 
 
 [11]
 Section 2 of Executive Order No. 12,291 provides:
 In promulgating new regulations ... all agencies, to the extent permitted by law, shall adhere to the following requirements ...
 (b) Regulatory action shall not be undertaken unless the potential benefits to society from the regulation outweigh the potential costs to society;
 (c) Regulatory objectives shall be chosen to maximize the net benefits to society....
 
 
 [46]
 Fed.Reg. 13,193 (1981). In Corrosion Proof Fittings v. E.P.A., 947 F.2d 1201 (5th Cir.1991), the court emphasized the need for the Environmental Protection Agency to exercise reasonable judgment when regulating toxic substances and to weigh the burden of a proposed regulation with the benefit. Id. at 1220-23. I realize OSHA and EPA operate under different enabling statutes, but the holding of Corrosion Proof Fittings offers guidance as to how all federal agencies should regulate
 
 
 [12]
 On July 12, 1991, the Center for Disease Control (CDC) issued recommendations for preventing transmission of HIV and HBV during "exposure prone invasive procedures." The CDC guidelines require all health care workers to "adhere to universal precautions, including the appropriate use of hand washing, protective barriers, and care in the use and disposal of needles and other sharp instruments." The guidelines also require that health care workers comply with current guidelines for disinfection and sterilization of reusable devices used in invasive procedures." Importantly, the CDC guidelines allow medical organizations to identify which invasive procedures are "exposure-prone." See, e.g., Ill.Admin.Code tit. 77 § 693.10-693.45 (1992); Ind.Admin.Code tit. 410 § 1-4 (1992); the Wisconsin Department of Health and Social Services has adopted voluntary guidelines to be enforced by the Department of Regulation and Licensing, see Recommendations for Preventing Transmission of HIV and HBV (October 28, 1992)
 
 
 [13]
 The observance of well-recognized infection prevention procedures greatly reduces the risk of infection to health care employees. One CDC study concluded: "There is no evidence that medical or dental workers identified by [HBV] testing who practiced good techniques will transmit hepatitis B to their patients." Hepatitis B Transmission Between Dental or Medical Workers and Patients, 95 Annals of Internal Medicine 229, 230 (1981). "[O]ne is left with the conclusion that a major amount of HBV transmission results from failure to observe good standards of dental and medical practice." Id. The CDC identified following "universal precautions including glove use" as procedures to reduce the spread of infection. There is no need for a separate federal agency (OSHA) to mandate new and unnecessary rules when appropriate standards already exist
 
 
 [14]
 I recognize the possibility of occupational exposure to bloodborne pathogens in a dentist's office. However, a dentist's risk is far less than that of that of other health care professionals, such as orthopedic, heart, vascular or neurosurgeons, and thus they are less susceptible to occupational exposure to bloodborne pathogens. The dentist normally operates in a controlled environment (90% of patients have an appointment as contrasted with a hospital emergency room) and thus knows what to expect and/or how to prepare the staff for possible exposure to infection from any given patient as well as knowing when and where to wear gloves or a mask if necessary in the exercise of acceptable medical judgment. OSHA appendix at 48 (citing 1988 ADA survey)
 
 
 [15]
 The risk of exposure is also reduced because many dentists now use aspirators placed directly in the oral cavity that continually withdraws the blood seeping from the puncture or laceration of gum tissue thus eliminating to a great extent the chance of exposure to the dentist or employees. OSHA appendix at 50
 
 
 [16]
 OSHA relies on Associated Builders and Contractors, Inc. v. Brock, 862 F.2d 63, 68 (D.C.Cir.1988), cert. denied, 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 472 (1990), which held "[a] requirement that the Secretary assess risk to workers and need for disclosure with respect to each substance in each industry would effectively cripple OSHA's performance of the duty imposed on it...." OSHA's reliance on Associated Builders is misplaced because that case involved "thousands of chemical substances used in numerous industries," id., the bloodborne pathogens standard only involves one substance (blood) and only a handful of distinct sectors. Clearly disaggregation would have been possible and appropriate
 For a brief discussion of the problems posed by OSHA inspectors seeking to enforce the rule see infra at 846-47.
 
 
 [17]
 Additionally, the American Medical Association and the American Dental Association have recommended that HIV-infected personnel should refrain from performing invasive procedures. Karen C. Lieberman & Arthur R. Derse, HIV-Positive Health Care Workers and the Obligation to Disclose: Do Patients Have a Right to Know?, 13 J. Legal Medicine 333, 339 (1992). It seems quite obvious that the CDC, state agencies and professional organizations (who are more qualified than OSHA) should establish the regulations and guidelines that govern the health care profession
 
 
 [18]
 "Exposure incident means a specific eye, mouth, other mucous membrane, non-intact skin, or parenteral contact with blood or other potentially infectious materials that results from the performance of an employee's duties." 56 Fed.Reg. 64175 (quoting § 1910.1030(b) of the Bloodborne Pathogens standard)
 
 
 [19]
 There are reputable commentators who maintain that saliva, rather than transmitting HIV, may actually inhibit its transmission. P. Fox, et al., Salivary Inhibition of HIV-1 Infectivity: Functional Properties and Distribution in Men, Women and Children, 118 J.Am.Dental Assoc. (JADA) 709 (1989)
 
 
 [20]
 Lieberman & Derse, supra note 17, document the cases giving rise to the common law right to informed consent and conclude that a patient has a right to know whether his health care provider is HIV-infected. Id. at 342-56. "As a further consideration, even if it is assumed that the risk of transmission from health care worker to patient during an invasive procedure is quite low, various courts have held that the fact a risk is remote will not always negate the duty to disclose under the informed consent doctrine." Id. (citations omitted). "The fact that the health care professions themselves are uncertain about the degree of risk to patients is all the more reason why patients should be in a position to decide for themselves whether to accept the risk, as the courts have held." Id. at 348 n. 91. "While the risk of transmission of HIV from health care worker to patient during an invasive procedure may be low, the consequence of the occurrence of that risk at this time appears invariably to be death." Id. at 350. "When a health care worker permits a patient to be placed at risk in order to obtain personal benefit, even when the risk is as potentially remote as transmitting HIV to an uninfected patient, the health care worker's interests conflict with those of the patient [in violation of the fiduciary duty]." Id. at 353
 
 
 [21]
 Eighty-six percent of adults surveyed in a Gallup Poll said patients "should be told if the health care worker caring for them has AIDS." Larry Gostin, Hospitals, Health Care Professionals, and AIDS: The "Right to Know" the Health Status of Professionals and Patients, 48 Md.L.Rev. 12, 14. Without such information, a patient who is infected by a health care professional could unwittingly spread the infection to others
 
 
 [22]
 OSHA's Bloodborne Pathogens Standard makes no provision for an employer to be made aware of his employee's health status through a documented record or health report even when the employee may suffer from fatigue and thus render a less than professional performance or expose himself or another to danger because of HBV or HIV infection
 
 
 [23]
 OSHA rationalizes the thirty year requirement by stating:
 "Retaining medical records for the period of employment plus thirty years is necessary because hepatocellular carcinoma, which can occur as a result of hepatitis B infection can, and indeed commonly does, take twenty to thirty years to develop. Individuals who become HBV carriers or develop chronic hepatitis are often ill and infected for the rest of their lives. Moreover, OSHA believes this is an appropriate time period, in light of the fact, that 5% of those exposed to HIV infected blood do not seroconvert within six (6) months. Finally, the time period for retention of records is consistent with other OSHA standards requiring retention of occupational medical records."
 
 
 [56]
 Fed.Reg. at 64171
 
 
 [24]
 One example of understated time costs concerns those practicing in Pediatric Dentistry. The ADA has argued that a child may be traumatized by the sight of a dentist wearing goggles and a mask. This argument only scratches the surface of the real problem. A dentist wearing goggles and a mask may have to take more time to calm a child (especially one in for emergency treatment because of an injury) before instituting treatment. Those children unable to be calmed frequently must undergo a general anesthesia rather than a topical anesthesia. This increases the risk to the child, the number of assistants necessary to position and monitor the limp patient, the cost, and the potential liability to the dentist as well as increasing the time to conduct the procedure
 
 
 [25]
 Additionally, the estimated cost of reusable gowns is approximately $28 million, resulting in a total cost of $143 million to satisfy the laundering regulations. OSHA did not prepare any cost estimates on the cost of the purchasing and laundering reusable fabric gowns. 56 Fed.Reg. 64065; ADA Appendix at 220
 This court attempted, though unsuccessfully, to resolve the confusion between the ADA's laundering estimate during the rule making procedure and the estimate in their brief before this court. Unfortunately, we have only an index of documents filed during the rule making and any cost estimates derived subsequent to the rule making procedure are inadmissible.
 
 
 [26]
 Some confusion exists as to cost estimates because the rule applies only to employees. For the purpose of the rule, a dentist who has incorporated his or her practice (S.C.), probably for tax purposes, is considered an employee of the corporation while a dentist who has not incorporated is not an employee and thus not covered under OSHA. Therefore, OSHA can minimize the costs of complying with the rule by only including the costs of those dentists who are employees of corporations
 
 
 [27]
 In their brief before OSHA responding to the proposed bloodborne pathogens standard, the ADA estimated the cost of compliance with the rule to be $524,541,564. OSHA appendix at 49-50. OSHA's estimate that the rule will increase costs of health care by $817 million annually is certainly an understatement. More importantly though, considering the fact that the states, the CDC and the professional groups are and have been regulating for a period of time, could not these same dollars be more wisely spent on research to halt the deadly effects of heart disease, cancer, stroke and AIDS?
 
 
 [28]
 Another omission in the feasibility analysis is the failure to include any costs for complying with the OSHA engineering standards in §§ (d)(2)(iii), (d)(4)(iii)(B) requiring employers to make sinks readily accessible for hand washing (irrespective of the fact the states already have similar regulations) and ensuring proper storage of regulated waste. 56 Fed.Reg. 64065. A final example of the flawed feasibility analysis is OSHA's estimate that the procedure following an employee's exposure to bloodborne pathogens, § (f)(3), would only take 20 minutes. For a hospital employee (with immediate access to a physician) this may be reasonable, but for a dental worker this procedure would more likely take one-half day traveling to and from the office in addition to the waiting time, time for taking the medical history including information concerning the exposure incident, as well as the time for the testing procedure in the physician's office. This would amount to 12-14 lost work days per year. OSHA appendix at 71-72
 
 
 [29]
 See, e.g., Budget of the United States Government (Fiscal Year 1993), Part One at 113-115, U.S. Government Printing Office (1992)