**MONSANTO COMPANY, Petitioner,**

v.

**ENVIRONMENTAL PROTECTION AGENCY and Carol M. Browner, Administrator, Respondents.**

No. 92–4067.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 22, 1993.

Decided March 24, 1994.

---

James T. Harrington (argued), Steven M. Taber, Ross & Hardies, Chicago, IL, for petitioner.

William K. Reilly, Lawrence J. Jensen, E.P.A., Washington, DC, Valdas V. Adamkus, E.P.A., Region 5, Office of the Regional Counsel, Chicago, IL, Alan D. Greenberg (argued), Dept. of Justice, Environmental Defense Section, Washington, DC, for E.P.A.

Alan D. Greenberg, Myles E. Flint, Dept. of Justice, Environmental Defense Section, Washington, DC, for Carol M. Browner.

Before COFFEY, and EASTERBROOK, Circuit Judges, and FOREMAN, District Judge.*

FOREMAN, District Judge.

The Monsanto Company brings this petition for review of an Environmental Protection Agency decision that denied Monsanto's request for additional time to comply with certain hazardous emissions standards under

* Hon. James L. Foreman, of the Southern District of Illinois, is sitting by designation.

the Clean Air Act. For the reasons given below, we grant the petition and reverse the agency's decision.

At issue in these proceedings is Monsanto's compliance with the EPA's emissions limit for benzene. 40 C.F.R. § 61.271 (1990). This standard was promulgated by the EPA on September 14, 1989, and became effective for new or modified sources on that date. 42 U.S.C. § 7412(b)(1)(C) (1988). However, it did not apply to existing sources, such as Monsanto's monochlorobenzene manufacturing facility in Sauget, Illinois, until 90 days after its effective date. *Id.* § 7412(c)(1)(B)(i). The Clean Air Act also gave the EPA Administrator authority to grant a waiver to existing sources for a period of up to two years "if he finds that such period is necessary for the installation of controls and that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment." *Id.* § 7412(c)(1)(B)(ii).

Monsanto was not prepared to comply with the new benzene standard in December 1989 and, therefore, requested a waiver until August 15, 1990, to allow the company to install water scrubbing equipment designed to satisfy the standard. The EPA granted this request. However, after the equipment was installed, Monsanto discovered that the equipment did not perform as anticipated. Instead of achieving the 95 percent emissions reduction that the benzene standard requires, the water scrubber system appeared to be operating at about an 80 percent reduction level.[1] The company, therefore, asked the EPA for an extension of the waiver so that it could install a carbon adsorption system as a secondary means of filtering out the harmful emissions that were not captured by the primary system. The EPA denied this second request, leading to the pending petition for review under § 307(b) of the Clean Air Act. *Id.* § 7607(b)(1).

As a preliminary matter, we must determine whether this Court has jurisdiction over the pending proceeding. Federal courts "are empowered to hear only those cases that (1) are within the judicial power of the United States, as defined in [Article III of] the Constitution, and (2) that have been entrusted to them by a jurisdictional grant by Congress." 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3522, at 60 (2d ed. 1984). In this case, § 307(b) of the Clean Air Act provides for judicial review of EPA orders relating to compliance with hazardous emissions standards. In fact, as Monsanto's counsel pointed out in oral argument, § 307 virtually compelled the company to seek an immediate review of the agency's denial of the waiver or it would lose the defense. *See* 42 U.S.C. § 7607(b)(2) ("Action of the Administrator with respect to which review could have been obtained under [§ 307(b)(1)] shall not be subject to judicial review in civil or criminal proceedings for enforcement.").[2] Thus, it seems clear that a statutory grant of jurisdiction exists. But a more complex question is presented with regard to the constitutional requirement.

Upon first impression, one might think that Monsanto is merely seeking an

---

1. Monsanto argues that its test results were not conclusive because the EPA had not sanctioned an approved test method. As Monsanto points out, EPA's regulations require existing sources to provide "[d]ocumentation[] demonstrating that the control device being used achieves the required control efficiency...." 40 C.F.R. § 61.272(c)(1)(i). The regulation does not explain what type of documentation is required or what test method should be used to determine the control efficiency. Because the EPA had not established an approved test method, Monsanto argued that "it is entirely possible that this control equipment is achieving the capture efficiency required under the benzene [standard]." Monsanto Letter of June 17, 1991, at 4. In fact, Monsanto apparently was told by EPA's research facility at Research Triangle Park, North Car-

olina, that documentation showing that the equipment was designed to achieve a 95 percent control efficiency would be sufficient to meet the documentation requirement. *Id.*

2. Of course, if we were to decide that this Court lacked jurisdiction because Monsanto is seeking an advisory opinion, an order dismissing the petition for review would mean that judicial review "could [not] have been obtained" under § 307(b)(1). Monsanto presumably could then bring the waiver issue as a defense to an enforcement proceeding by the EPA. However, we need not reach that issue because we have determined that an actual controversy exists and, therefore, we would not be rendering an advisory opinion.

advisory opinion, which would run afoul of the "case or controversy" requirement of Article III. *See Flast v. Cohen,* 392 U.S. 83, 96, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968). At the time that the petition for review was filed, the EPA had not commenced any enforcement proceedings against the company and, in the exercise of its prosecutorial discretion, may decide against pursuing such an action altogether. Moreover, even if the EPA did file suit, the case might be decided on grounds unrelated to the waiver. Thus, any decision we make with respect to the waiver issue would be of no consequence should the EPA forgo enforcement proceedings or should that suit be decided on other grounds.

But those circumstances would not render our decision an advisory opinion. To the contrary, Monsanto and the EPA clearly have adverse legal interests with respect to Monsanto's request for a waiver, and Monsanto has petitioned this Court for a determination of the legal consequences of the EPA's decision. The federal courts have long recognized in the declaratory judgment setting that once the parties are locked in controversy with stakes fixed by past events, it does not matter who initiates the litigation. *See* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2757, at 585 (2d ed.1983) (and the cases cited therein). The same holds true in Monsanto's situation. Although there is some risk that a decision by this Court in the EPA's favor could be made nugatory by later developments, there is no such risk if we decide in Monsanto's favor because if we find that Monsanto was entitled to a waiver, then the company would not be subject to enforcement proceedings for a violation of the emissions standard. We, therefore, find that we have jurisdiction over this proceed-

ing and turn to the merits of Monsanto's petition for review.

Under § 112(c)(1)(B)(ii) of the Clean Air Act, the Administrator of the EPA "may grant a waiver permitting [a stationary source] a period of up to two years after the effective date of a standard to comply with the standard, if he finds that such period is necessary for the installation of controls" and that steps in the interim will "assure that the health of persons will be protected from imminent endangerment." 42 U.S.C. § 7412(c)(1)(B)(ii). No one contends that Monsanto exposed any person to "imminent endangerment," so the question is whether the Administrator acted arbitrarily in deciding that two years was not "necessary" for Monsanto to comply with the benzene standard.

The EPA granted Monsanto's initial request for a waiver. Thus, there appears to be no dispute that as of December 1989, the company needed additional time in which to install the equipment needed to control its benzene emissions. The question is whether it was "necessary" for Monsanto to have an extension of the original waiver when the company discovered in August 1990 that its control technology did not perform as predicted and, therefore, the company could not demonstrate that it was meeting the benzene emissions standard.

In stating its intent to deny the request for an extension, the EPA found that Monsanto's request did not provide sufficient information to show that an additional waiver of compliance was necessary. Many of the concerns identified by the EPA were valid.[3] However, Monsanto subsequently submitted a thorough response to each of these concerns. The company explained that in designing its original system, it had decided to install a water scrubber system because that system would allow the company to recover and

---

**3.** The EPA's letter identified the following deficiencies in Monsanto's request: (1) at no time during the period of the initial waiver did Monsanto inform EPA that its initial compliance may fail to meet the benzene emissions standard; (2) Monsanto provided no information indicating the reasons for the failure of the initial method or whether such failure was foreseeable; (3) Monsanto apparently had no contingency plan in effect in case of this failure; (4) Monsanto pro-

vided no information as to why carbon adsorption or other alternative control methods were not used; and (5) based upon the fact that Monsanto was now planning to install a carbon adsorption system, and predicted it could be installed within six months, the record shows that Monsanto could have installed carbon adsorption in the first place and been in compliance with the emissions standard within six months after the standard went into effect.

reuse the benzene and other organic chemicals. The company decided against using the alternative control measure of carbon adsorption, which uses carbon filters to reduce benzene emissions, because this "end-of-the-pipe" technology would produce benzene-contaminated carbon. In short, instead of recapturing and reusing the benzene, carbon adsorption would create a hazardous waste that would require special treatment or disposal.

The company similarly decided against incineration because that "end-of-the-pipe" alternative would produce waste gases. Carbon adsorption and incineration also had several other disadvantages that were not present in the water scrubber system.[4] "In the final analysis and in keeping with the U.S. EPA's 'preferred waste treatment' policy, Monsanto sought to eliminate wastes first, recycle or re-use second, and only if those two options were not available, 'dispose' of the waste." Letter of August 19, 1992, at 3.

The company informed the EPA that through computer modeling and a previous test of this type of equipment, Monsanto had predicted that the water scrubber system could achieve more than a 95 percent reduction in benzene emissions. In fact, in the previous test, the equipment was achieving close to 99 percent emissions reduction. However, after construction was complete, Monsanto's tests showed for the first time that the equipment was actually removing less than 80 percent of the benzene. The company then promptly contacted the EPA and began the process of requesting an extension of its waiver so that the company could install a secondary system, using carbon absorption to capture the benzene that escaped through the primary water scrubber system. Monsanto, therefore, provided the information that was lacking in its original request.

In upholding its preliminary decision to deny the extension, the EPA maintained its position that additional time was not "necessary" because Monsanto could have installed carbon adsorption in the first place.

There is no question that carbon adsorption was a control technology available to Monsanto at the time that it originally requested a waiver of compliance on December 7, 1989, although Monsanto argues that it presented "several major problems." ...

. . . . . .

Monsanto makes no claim that it could not have installed carbon adsorption under its initial waiver, but asserts that disposing of waste generated by the use of carbon adsorption involved considerable expense, and raised safety and environmental concerns if it was not disposed of properly. Such concerns do not allow Monsanto to continue emitting benzene into the air in violation of the benzene NESHAP, beyond the date by which it was required to demonstrate compliance.... Carbon adsorption was available, and is acknowledged by Monsanto as having achieved "more than 95% consistent removal." ... Monsanto's choice of water scrubbing as its control technology on December 7, 1989, allowed continued emissions of benzene into the air by Monsanto, in amounts in excess of the NESHAP, thereby threatening public health and the environment.

EPA's Letter of Oct. 19, 1992, at 4.

The EPA expressly rejected Monsanto's claim that it "proceeded reasonably in terms of developing and implementing controls," and that carbon adsorption was "a choice of last resort because it offered the least opportunity for waste immunization and the greatest concern for safety[.]" *Id.* at 5.

The CAA does not authorize the Administrator to grant a waiver of compliance in order to allow a source more time to "proceed reasonably" in experimenting with the various available technologies, saving those technologies the source believes cause "considerable expense" and increase "safety concerns" for last.... If a source

---

4. Unlike the water scrubber system, neither incineration nor carbon adsorption would control hydrochloric acid (HCL). Thus, both of the alternatives would require HCL scrubbing prior to entry into the adsorption system to prevent damage to the equipment. Both alternatives also posed special safety concerns—e.g., the hazards of having the incinerator's open flames in a department that handles large quantities of flammable materials.

can install technology that will control the emissions, it must; only if additional time beyond the required compliance date "is necessary for the installation of controls," may the Administrator grant it additional time.

In that Monsanto acknowledges that carbon adsorption could be used at its facility in December 1989, and that, when in operation at its facility it did achieve greater than 95% consistent removal, U.S. EPA cannot find that additional time beyond that granted in the original waiver was "necessary for the installation of controls." *Id.*

The EPA's explanation grossly mischaracterizes Monsanto's approach. The company was not "experimenting" with the various technologies; rather, it had made a scientifically and environmentally sound decision to proceed with the water scrubber system. The system was designed to achieve better than the 95 percent emissions removal required by the statute and had performed up to those standards during a limited test. Thus, Monsanto, as well as the EPA, had every reason to believe that the company was installing technology that would control the emissions.

The EPA's decision also ignores the fact that Monsanto chose the water scrubber system to comply with the EPA's own pollution prevention policy. See Pollution Prevention Policy Statement, 54 Fed.Reg. 3845 (Jan. 26, 1989). "EPA is committed to working with individuals and organizations (both public and private) to make source reduction and as a second preference, environmentally sound recycling, the major focus of future environmental protection strategies." *Id.* "The Agency believes that source reduction (including closed-loop, in-plant recycling) can reduce risk and should be implemented in a cost efficient manner. *It is generally pre-*

*ferred over other management approaches." Id.* (emphasis added).[5]

We recognize that the Clean Air Act required companies like Monsanto to comply with the emissions standards, if possible, by December 1989. Therefore, if Monsanto had the means to control its emissions by that date, it may have been required to implement those means—even if that strategy would have been less environmentally desirable than its proposed water scrubber system. However, the record shows that Monsanto did not have the controls needed to comply with the benzene standard at that time; it clearly needed additional time to install appropriate controls. The question then becomes whether the EPA should follow its pollution prevention policy by allowing Monsanto to choose the control strategy that was designed to meet the benzene standard in the most environmentally sound manner or whether Monsanto was required to use the carbon adsorption strategy.

The EPA's decision appears to suggest that if Monsanto could have installed a carbon adsorption system in less time than it took to install the water scrubber system, then the EPA would find that it was not "necessary" to give Monsanto whatever additional time the water scrubber system would require. In other words, EPA seems to be saying that if a "quick fix" is available, sources are required to employ that "quick fix" without regard to its adverse environmental ramifications. This viewpoint is short-sighted and bad environmental policy. Instead of eliminating an environmental problem, the EPA's "quick fix" would merely change the form of the problem—i.e., it would remove the environmental hazard from the air but create a hazardous waste disposal problem.

■ Obviously, an agency's interpretation of a federal statute is entitled to great deference and "a court may not substitute its own

---

**5.** This policy has been codified in the Pollution Prevention Act of 1990, 42 U.S.C. §§ 13101–13109 (1993), which declares that it is

the national policy of the United States that pollution should be prevented or reduced at the source whenever feasible; pollution that cannot be prevented should be recycled in an environmentally safe manner, whenever feasi-

ble; pollution that cannot be prevented or recycled should be treated in an environmentally safe manner whenever feasible; and disposal or other release into the environment should be employed only as a last resort and should be conducted in an environmentally safe manner. *Id.* § 13101(b).

construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). However, we are unconvinced that the EPA's construction of the waiver provision is reasonable—especially when it is contrary to the agency's own pollution prevention policy and the Pollution Prevention Act of 1990 and the EPA has not provided any explanation for a departure from that policy. Indeed, the EPA's decision is devoid of any rationale to support its rigid construction of the waiver provision.

■ The Clean Air Act's waiver provision does not require the source to install the controls that will achieve compliance at the earliest possible date. Instead, it gives the EPA authority to grant a waiver of up to two years as long as there is no imminent endangerment to the public in the interim. Therefore, if a company like Monsanto has a choice between two control strategies, the EPA has the authority to grant a waiver for a pollution prevention strategy even if that strategy would take slightly longer to implement than the less desirable strategy. This assumes, of course, that the pollution prevention strategy will work and can be installed within the two-year waiver period.

■ Those requirements were satisfied in this case. Monsanto's water scrubber system was designed to achieve full compliance with the statute—and has achieved full compliance once the secondary carbon adsorption controls were added. Although full compliance was not achieved within the eleven-month time frame that Monsanto first envisioned, it was accomplished within two years after the statutory deadline. Neither Monsanto nor the EPA had any reason to believe that Monsanto's initial system of choice would not perform up to expectations. Thus, it was arbitrary and capricious to deny Monsanto the additional time it needed to perfect its system.

The EPA's analysis suffers from an even more fundamental defect. The agency finds that Monsanto could have achieved compliance within the original waiver period if it had chosen the carbon adsorption strategy as its primary system. The record provides no foundation for this conclusion. *See Motor Vehicle Mfr.'s Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) ("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, *offered an explanation for its decision that runs counter to the evidence before the agency,* or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.") (emphasis added).

The EPA states that carbon adsorption was available at the time that Monsanto originally requested a waiver. Because Monsanto was able to install a carbon adsorption system within several months after it discovered that its water scrubber strategy was inadequate, the EPA assumes that Monsanto could have installed the carbon adsorption system as its primary system within the same amount of time. To the contrary, Monsanto clearly informed the EPA that the installation of carbon adsorption as a *primary* method of control "would have been geometrically longer" than its installation of the carbon adsorption system as an *additional* control. It is unfortunate that Monsanto was not more specific as to how much longer it would take to install the larger system. However, that does not detract from the fact that Monsanto made the EPA aware of the substantial time difference. Thus, there is no support for the EPA's assumption that Monsanto could have installed carbon adsorption as its primary control strategy within the original waiver period.

The EPA also erroneously states that Monsanto "acknowledged" that carbon adsorption achieved "more than 95% consistent removal." To the contrary, Monsanto stated that its total system—utilizing a water scrubber as the primary system and carbon adsorption as an additional control, picking up what the water scrubber missed—achieved more than 95 percent consistent removal. The EPA has arbitrarily assumed that if the carbon adsorption worked in this setting, it would achieve the same results on a larger

scale. Obviously, based upon Monsanto's experience with its water scrubber system, that assumption is not necessarily correct.

In sum, Monsanto's original choice of the water scrubber system was environmentally and scientifically sound. The system was designed to achieve full compliance within the initial waiver period granted by the EPA. Although the system did not live up to its full expectations, Monsanto promptly asked the EPA for additional time to add a carbon adsorption process that would bring the system into full compliance with the emissions standard within the two years allowed by the statute. The reasons given by the EPA for denying the request have no foundation in the record. Therefore, we find that the EPA was arbitrary and capricious in denying Monsanto's request for an extension of its waiver. Accordingly, we hereby GRANT Monsanto's petition for review and REVERSE the EPA's decision.

EASTERBROOK, Circuit Judge, dissenting.

I agree with the majority that the petition for review presents a controversy within the judicial power, but that is as far as our agreement reaches. The majority says that the question on the merits is "whether it was 'necessary' for Monsanto to have an extension of the original waiver when the company discovered in August 1990 that its control technology did not perform as predicted". Opinion at 1204. Putting things in this way shows principally that the wrong question begets the wrong answer.

Under 42 U.S.C. § 7412(c)(1)(B)(ii) (1988) the Administrator of the EPA "may grant a waiver permitting [a stationary source] a period of up to two years after the effective date of a standard to comply with the standard, if he finds that such period is necessary for the installation of controls" and that steps in the interim will "assure that the health of persons will be protected from imminent endangerment." "May" grant, not "must" grant. A finding that more time is "necessary" to comply with the rules is a necessary but not a sufficient condition of a waiver. The applicant must persuade the Administrator that a favorable exercise of discretion is appropriate. Statutes of this kind are common. Like rules of judicial procedure that permit judges to grant litigants more time, they permit the person in charge to exercise discretion. Nothing in § 7412(c)(1)(B)(ii) or in any of the regulations sets out criteria under which anyone is *entitled* to a waiver. The Administrator "may" grant waivers but would be within her rights to limit them to extraordinary cases. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *United Auto Workers v. Dole,* 919 F.2d 753, 755–58 (D.C.Cir.1990); *Wisconsin Electric Power Co. v. Reilly,* 893 F.2d 901, 907 (7th Cir.1990); *Ethyl Corp. v. EPA,* 541 F.2d 1, 34 (D.C.Cir.1976) (en banc). Cf. *INS v. Jong Ha Wang,* 450 U.S. 139, 144–45, 101 S.Ct. 1027, 1031, 67 L.Ed.2d 123 (1981). Monsanto does not cite, and I could not find, any case holding that the EPA *must* grant more time than the 90 days the Clean Air Act prescribes as the norm.

As it happened, the EPA gave Monsanto more than the 90 days. It allowed 11 months—all the time Monsanto originally requested—to comply with the standard. Monsanto believes that the agency's failure to grant an additional 13 months, up to the statutory maximum, is arbitrary. A water scrubbing system returns benzene to the storage vessel for reuse. Congress believes that such systems are preferable to end-of-the-pipe devices that capture the hazardous substance and either destroy it and create byproducts (as incineration does) or mix it with other substances for disposal. See 42 U.S.C. § 13101 (Supp. II), added by the Pollution Prevention Act of 1990; 42 U.S.C. § 7401(c) (Supp. II), added by the Clean Air Amendments Act of 1990. After it discovered that the water scrubbing system it had installed removed 80% of the benzene rather than the necessary 95%, Monsanto told the EPA that it was considering both incineration and carbon adsorption as supplementary technologies to remove the remaining benzene. After Monsanto settled on carbon adsorption—which leaves a slurry of carbon, benzene, and other substances that must be buried or otherwise disposed of—the EPA turned down its request for more time. Ac-

cording to the EPA's letter denying the request for additional time, Monsanto could have installed carbon adsorption units at the beginning, bringing itself into compliance with the benzene standard in less time than the 24 months it wanted. As Monsanto portrays these events, the EPA thus "penalized" it for its initial choice of water scrubbing.

There might be a problem if the EPA had said something like: We will give you 24 months if you want to install carbon adsorption technology (dirty) but only 11 months if you want to use water scrubbing (clean). What it said, however, is that Monsanto could have 11 months to install water scrubbing and no additional time to add carbon adsorption. Any thumb on the scale favored the cleaner technology. Actually, however, there was no thumb at all. The EPA did not favor either technology; it allowed Monsanto to choose and then insisted that Monsanto keep its word that it would comply by August 1990. If it is apt to apply the word "penalty" to this sequence, then the event penalized is *failure*. The EPA gave Monsanto enough time to install a control technology of Monsanto's choosing. When this strategy flopped, the EPA concluded that Monsanto rather than the public should pay the price. Although Monsanto contends that it acted in the best of faith—that computer modeling showed that water scrubbing would work, and that it was dismayed when the predictions did not come true—the EPA may insist, as pollution control statutes generally do, on results. *Union Electric Co. v. EPA*, 427 U.S. 246, 257–60, 96 S.Ct. 2518, 2525–27, 49 L.Ed.2d 474 (1976). An A for effort may affect the selection of a penalty in an enforcement proceeding (or may influence the exercise of prosecutorial discretion), but it does not compel the EPA to give a polluter the maximum waiver permitted by law.

Monsanto contends, and the majority believes, that the EPA misunderstood the original possibilities. Suppose Monsanto had two choices: (a) install water scrubbing equipment and, if this is not completely successful, add a small carbon adsorption unit to remove benzene from gasses that get past the scrubber; (b) install a larger carbon adsorption unit as the sole pollution control method. If these two strategies are equally costly and

take an equal time to accomplish, then the former should be preferred because it produces less toxic waste and because the initial scrubbing stage can be put in place faster, reducing aggregate emissions. Monsanto submits that the EPA acted arbitrarily in denying it enough time to complete the second stage of strategy (a), when it would have afforded the 24 months needed for strategy (b). Yet nothing in the EPA's decisions suggests that it would have allowed 24 months for strategy (b). To the contrary, the EPA believed that strategy (b) would itself have taken only 11 months, making a full 24–month waiver unnecessary. Monsanto thinks that the EPA's belief about the time that would have been necessary to install carbon adsorption from the start is unsupported, making its decision an abuse of discretion. Monsanto did not furnish the EPA with the facts necessary to support its position, however. Instead of providing, say, an engineer's report showing why strategy (b) would have taken 24 months, Monsanto submitted this rhetoric:

A second incorrect assumption that the U.S. EPA relies on is that "the record indicates that Monsanto could have been in compliance within six months after December, 1989." It bases this conclusion on the fact that "once Monsanto decided to use a carbon absorption [sic] unit as its control technology, it could project that it would have the unit 'up and running' within four months, and that it would be in final compliance within six months." This ignores the fact that the modifications to the water scrubbers remain in place and are the primary method of control. The carbon adsorption unit is *additional* control so that compliance with the Benzene NESHAP is demonstrable. The four month and six month deadlines refer to the installation of additional control equipment, not the installation of a carbon adsorption unit as the primary method of control. Because a carbon adsorption unit as the primary method of control would have to be geometrically larger, the time for design and installation would have been geometrically longer.

Letter of August 19, 1992, at 9, with emphasis and brackets in original. What does it mean to say: "Because a carbon adsorption

unit as the primary method of control would have to be geometrically larger, the time for design and installation would have been geometrically longer."? How *much* larger? How *much* longer? The letter does not say. Why should the EPA believe that there is a geometric relation between the size of a mechanism and the time needed to install it? The letter does not say. The majority writes: "It is unfortunate that Monsanto was not more specific as to how much longer it would take to install the larger system." Opinion at 1207. "Unfortunate" is an understatement. How can it be an abuse of discretion to turn down a flatulent request? Monsanto bore the burden of persuasion; it submitted nothing but hot air (presumably benzene-free) and so must lose.

Undergirding the majority's opinion is an independent evaluation of the merits of different pollution-control strategies. Two judges believe that Monsanto "made a scientifically and environmentally sound decision to proceed with the water scrubber system" (opinion at 1206) and that the EPA's view is "short-sighted and bad environmental policy" (opinion at 1206). Yet the record in this case does not demonstrate that Monsanto's system is "sound" or that the EPA's view is "bad environmental policy". It contains essentially no evidence on these subjects (although Monsanto's brief is full of self-congratulation, which my colleagues have swallowed). We are not engineers and are in no position to evaluate the evidence it does contain, and at all events we are not the persons to whom Congress delegated the estimation of costs and benefits.

The EPA may have much to answer for in its design of benzene control rules. According to the Office of Management and Budget, the several benzene NESHAPs create costs as high as $168.2 million per premature death averted. *Regulatory Program of the United States Government, April 1, 1991—March 31, 1992* at 12. Costs in this range likely imperil more people than they protect. Higher income is associated with better nutrition and medical care; regulations creating costs exceeding $7.5 million per life (directly) saved may well yield greater indirect loss of life. See Stephen Breyer, *Breaking the Vicious Circle* 23 (1993) (citing empirical studies). Nonetheless, Congress vested in agencies rather than the judiciary the task of maximizing the benefits of safety regulation. *American Dental Ass'n v. Martin,* 984 F.2d 823, 825–27 (7th Cir.1993). Monsanto does not challenge the NESHAP for benzene storage vessels. We must assume, therefore, that expeditious compliance is desirable, and we must accept the EPA's judgment that speedy compliance has benefits exceeding the costs of using somewhat "dirtier" control strategies. The greater the gains from the rule, the more a rational person would sacrifice to achieve compliance sooner; yet Monsanto does not assess the safety effects of the benzene storage vessel rule. By refusing to extend the waiver, the EPA put Monsanto to a choice. Delay created the possibility of fines. It could spend more to expedite compliance, or it could pay the fines. Monsanto elected not to speed its efforts; now we excuse it from paying fines. Given the structure of the Clean Air Act, an incentive to comply sooner cannot be an abuse of discretion.

The EPA was entitled to be stingy when evaluating Monsanto's second application. The EPA need not continue granting extensions to a firm that bets on the wrong technology, as Monsanto did. My colleagues explain why they would have given Monsanto more time; they do not demonstrate that the Administrator's contrary decision was an abuse of discretion.